JEWEL FOLIAGE COMPANY, a Texas Corporation, Plaintiff,

v.

UNIFLORA OVERSEAS FLORIDA, INC., a Florida Corporation, et al., Defendants.

No. 80–59–Civ–Oc.

United States District Court, M. D. Florida, Ocala Division.

Sept. 22, 1980.

W. Stephen McConnell, Bailey's Cross-roads, Va., Timothy D. Ellis, Jacksonville, Fla., for plaintiff.

Robert W. Duckworth, Orlando, Fla., for defendants.

## OPINION

CHARLES R. SCOTT, Senior District Judge.

This case involves an application of the Anti–Dumping Act of 1916, 15 U.S.C. § 72 (hereinafter referred to as the 'Act'). Plaintiff is a Texas corporation engaged in the business of, *inter alia*, importing and distributing several varieties of cut decorative foliage. The subject of this suit is a variety of miniature palm commonly called wide–leaf comador[1] which is harvested from the jungles of Guatemala, Costa Rica, and parts of Mexico. The palm fronds or leaves are cut by native laborers, packed by mule or donkey to a collection site, and then shipped by either air or truck to a port of entry here in the United States. Upon its arrival in America, the foliage is sorted, preserved, and transported to wholesalers located primarily within the Southeast. The greenery finds its ultimate destination as background decoration in flower arrangements sold by retail florists.

In the one count complaint filed by plaintiff on April 29, 1980, it is alleged that, since September 1979, defendants have collectively engaged in the importation and sale of this cut decorative foliage in competition with plaintiff. Plaintiff claims that due to the terms of a certain contract, defendants are obligated to purchase a large quantity of wide–leaf comador from a harvester in Guatemala for which defendants previously had no market in the United States.[2] Plaintiff complains that, since September 1979, defendants have commonly

1. The cut decorative foliage is also traded under the names of Jade, Ancho, and Jungle.

2. Although only alluded to in the complaint, this contract with the Guatemalan harvester was apparently entered into by defendants so that another type of foliage could be procured. Plaintiff asserts that prior to the contract defendants purchased its limited needs of wide–

and systematically imported and sold this wide–leaf comador in the United States at prices substantially less than the actual market value or wholesale price in the principal markets supplied with Guatemalan foliage with the intent of injuring the industry in general, and plaintiff in particular. Plaintiff contends that this conduct is in violation of the Anti–Dumping Act of 1916, 15 U.S.C. § 72, and seeks injunctive relief [3] and treble damages.

All defendants have challenged the complaint by way of a motion for summary judgment or, alternatively, to dismiss. In addition, defendants Uniflora, Hamburg and Fritz G. Tempelhof have filed a motion for summary judgment or, alternatively, to dismiss based on other grounds. With respect to the first motion, defendants assert that plaintiff lacks standing to bring this action. Defendants argue that the Act was passed to protect American manufacturers against the introduction of foreign goods into the United States at prices designed to drive the American companies out of business. The Act was not, according to defendants, intended to provide one importer with a cause of action against another importer. In addition, defendants argue that an implied perishable goods exception to the proscriptions of the Anti–Dumping Act authorizes the dismissal of the suit.

Defendant Uniflora, Hamburg seeks dismissal of the suit on the basis that the undisputed facts show that it is not engaged in the importation of the decorative foliage into the United States and is in no way involved with the conduct of which plaintiff complains. Fritz Tempelhof contends that he should not be a party to this suit because he has acted in no other capacity than as an officer and director of the several defendant corporations.

The point of departure in any case involving the construction of a statute is a review of the language of the statute itself. The Anti–Dumping Act of 1916 provides:

It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production, or of other foreign countries to which they are commonly exported after adding to such market value or wholesale price, freight, duty, and other charges and expenses necessarily incident to the importation and sale thereof in the United States: Provided, That such act or acts be done with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States.

Any person who violates or combines or conspires with any other person to violate this section is guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding $5,000, or imprisonment not exceeding one year, or both, in the discretion of the court.

Any person injured in his business or property by reason of any violation of, or combination or conspiracy to violate, this section, may sue therefor in the district court of the United States for the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages sustained, and the cost of the suit, including a reasonable attorney's fee.

The foregoing provisions shall not be construed to deprive the proper State

leaf comador from plaintiff, whose source was the same harvester.

**3.** Plaintiff filed a motion for preliminary injunction on May 19, 1980. A hearing on this motion was commenced on July 1, 1980, but was continued upon the joint motion of counsel pending the Court's decision on the instant motions.

courts of jurisdiction in actions for damages thereunder.

15 U.S.C. § 72.

■ What is at first most notable in the text of the Act is the absence of any mention of or reference to domestic manufacturers. The term "manufacturer" is not even contained in the Act. The broad language appears to permit "any person" whose business or property has been injured by reason of a violation of the Act to bring suit in federal court. Although other rules of standing have been read into this phrase,[4] there is no indication that the term "any person" should be limited to domestic manufacturers. The statute merely uses the generic terms "industry" and "business" to describe the breadth of the Act's coverage. Reasoning from the negative then, the literal language of the Act would appear to allow persons other than the domestic manufacturers to seek redress under the Act.

The language of the proviso relating to intent lends support to this conclusion. There, again, no specific reference is made to domestic manufacturers. Instead, the terms "industry in the United States" and "trade and commerce in such articles in the United States" are used. Had the words "domestic manufacturer" been substituted for these phrases, a conclusion that the right to sue under the Act should be limited to domestic manufacturers would be much more compelling. The use of the broader terms, however, suggests that persons in addition to domestic manufacturers are entitled to be protected by the Act.

The scant legislative history of the Act does not refute this conclusion, although it does suggest that Congress had a limited purpose in mind when the bill was passed. Enacted as a section of the Revenue Act of 1916, the Anti–Dumping Clause was not a particularly momentous piece of legislation.

With the end of World War I in sight, Congress was concerned with the effect the importation of products from the recovering European countries would have on American industry. Congress feared that the European manufacturers would engage in unfair methods of competition in order to gain a foothold in the United States for the sale of their post–war products. To combat this perceived threat to the American manufacturers, Congress chose free trade over protectionist tariffs and made illegal only those actions which would thwart fair competition. *See Zenith Radio Corporation v. Matsushita Electric Industrial Co., Ltd.*, 494 F.Supp. 1190, 434 Trade Reg. Rep. (CCH) 1, 55 (E.D.Pa.1980).

That the Act was originally directed specifically toward post–World War I trade with European countries is therefore fairly obvious. However, when viewed in the broader context of other anti–trust legislation, the continued retention of the Act suggests that congressional intent should not be read quite so narrowly. The failure of Congress to repeal the Act after the perceived threat had passed would indicate that more was expected of the statute than originally intended. But more importantly, Congress apparently recognized that the Act plugged a hole in the other unfair competition legislation. As Judge Higginbotham pointed out in *Zenith Radio Corporation v. Matsushita Electric Industrial Co., Ltd.*, 402 F.Supp. 244, 249 (E.D.Pa.1975):

> The Anti–dumping Act of 1916, which gives rights to private parties injured by dumping violations, deals specifically with price discriminations between commodities sold to purchasers for use in the United States and commodities sold to purchasers for use in foreign countries. One can only wonder why Congress enacted this statute if, as plaintiffs contend, it had already prohibited international dumping in the Clayton Act.[5]

---

**4.** Most notable of the standing principles applied to Anti--Dumping cases is the requirement that the plaintiff's injury be a direct rather than remote result of the illegal activity. *See Bywater v. Matsushita Electric Industrial Co., Ltd., infra.*

**5.** Judge Becker has concluded that international dumping is covered by neither the Clayton Act nor the Robinson–Patman Act. *Zenith Radio Corporation v. Matsushita Electric Industrial Co., Ltd.*, 494 F.Supp. 1190, 434 Trade Reg. Rep. (CCH); 37 (E.D.Pa.1980).

Assuming that the policy behind the various anti-trust laws is to foster and protect fair and vigorous competition in the sale of goods and services in the United States, then the statute should be read in a manner that gives effect to these aims. If the dumping of foreign products on the American market adversely affects domestic manufacturers, it also harms other domestic businesses engaged in the importation of those products. The business of those importers who are not engaged in dumping activities will be reduced just as the business of the domestic manufacturers will be. To say that the manufacturers can sue to vindicate their losses, but that the importers cannot, does not fairly perceive the consequences of the illegal activity. The harm to the markets of the United States being the same, the importer should not be denied the right to avail itself of the Act's protections.

Defendants, however, cite the decisions in *Schwimmer v. Sony Corporation of America*, 471 F.Supp. 793 (E.D.N.Y.1979) and *Bywater v. Matsushita Electric Industrial Co., Ltd.*, Trade Reg. Rep. (CCH) p. 73,759 at 91, 201 (S.D.N.Y.1971) for the proposition that only manufacturers have standing to sue under the Act. These cases are not persuasive. In *Bywater* the plaintiffs were former employees of Emerson Radio and Phonograph Corporation who had lost their jobs allegedly because the dumping by Sony of television sets in the United States had put the Emerson plant out of business. The court's holding merely applied the principle of standing which requires the plaintiff's loss to be a direct, rather than an incidental, result of the defendant's anti-trust violations. The court found that plaintiffs were outside the "target area" of the violation and that their losses were only incidental.

In *Schwimmer*, the plaintiff complained that Sony was selling directly to other wholesalers at a price less than the products being sold to Sony's wholly-owned distributor from whom plaintiff purchased his inventory. Applying the same rule of standing, the court first held that the plaintiff was too far removed from the alleged discriminatory pricing to be entitled to sue

under either the Robinson-Patman Act or the Anti-Dumping Act of 1916. Then, recognizing that, though it "was passed to shield local manufacturers from unfair competition in local markets", the Act "is perhaps used to attack different evils today", the court opined that Sony's manufacturing competitors were the most appropriate persons to sue to prevent the dumping of Sony's products on the American market. Thus, the court felt that there was "even less reason to accord plaintiff standing to sue for violations of the Anti-Dumping Act than there [was] to permit him to bring action under the Robinson-Patman Act." The value of this apparent holding that only manufacturers have standing to sue under the Anti-Dumping Act is lessened by the acknowledgment of the court's previous ruling that the plaintiff was outside the "target area" of the proscriptions against the alleged discriminatory pricing. The court's citation of the *Bywater* decision also indicates that the stronger basis for the decision was the plaintiff's relationship to the alleged violations rather than the plaintiff's status as a non-manufacturer.

Defendants have made the additional argument that in no reported case has a plaintiff recovered under an Anti-Dumping action. This, of course, is immaterial. The plain language of the Act does not limit the right to sue to domestic manufacturers. The legislative history, although indicating that the original purpose was to protect local manufacturers from cheap European products, must be viewed in the light of the broader anti-trust legislation and its general policy to foster fair competition in the markets of the United States. Finally, there are no reported cases persuasively holding that the protections afforded by the Act should be limited to manufacturers. Accordingly, the Court will decline defendants' invitation to limit the Act's application and deny defendants' motion to dismiss or, alternatively, for summary judgment on the grounds that plaintiff lacks standing to sue.

Defendants also seek dismissal or, alternatively, summary judgment on the basis

that the Anti–Dumping Act does not apply to perishable goods. Defendants compare the Anti–Dumping Act, a prohibition against international price discrimination, with the Robinson–Patman Act, a prohibition against domestic price discrimination. The latter contains a proviso excluding price changes necessitated by the deterioration of perishable goods. Defendants argue that a similar exception should be read into the Anti–Dumping Act so that the international dumping of perishable goods would be exempt from the Act's coverage.

Assuming, without deciding, that such an exemption may be read into the Anti–Dumping Act, defendants' motion must still be denied. Under the Robinson–Patman Act, the issue of whether or not an application of the perishable goods exemption is appropriate depends upon the particular facts of the case. *See Robbins Flooring, Inc. v. Federal Floors, Inc.*, 445 F.Supp. 4, 9 (E.D.Pa.1977). Likewise, if such an exemption exists under the Anti–Dumping Act, its application must be determined in light of the facts involved. Thus, the appropriateness of an application may not be decided on the basis of a motion to dismiss. Moreover, in the present case, since there remain disputed issues of material fact regarding the purpose, necessity, and duration of defendants' prices, a summary judgment is premature. Accordingly, this ground can afford defendants no relief at this time.

The motion of defendants Uniflora, Hamburg and Fritz Tempelhof to dismiss or, alternatively, for summary judgment, however, will be granted. The undisputed facts show that the only connection Uniflora, Hamburg has had with the alleged dumping is that its principal stockholder, Fritz Tempelhof, is also the principal stockholder of Uniflora Overseas, Florida, Inc. and Holiday Foliage, Inc. Plaintiff's broad allegation that "defendants and each of them" dumped Guatemalan foliage on the American market is thus rebutted by the admissions of Mr. Frank Rogers, President of plaintiff, that Uniflora, Hamburg has not engaged in the sale of cut decorative foliage in the United States. The principle of guilt by association having long since been rejected in Anglo–Saxon legal theory, the motion of Uniflora, Hamburg for summary judgment will be granted.

Finally, it is well established that a corporation can only act through its agents and representatives, *Webb v. Culberson, Heller & Norton, Inc.*, 357 F.Supp. 923, 924 (N.D.Miss.1973) and, therefore, a corporation cannot conspire with its officers, directors, or employees, *Girard v. 94th Street & 5th Avenue Corp.*, 530 F.2d 66, 70 (2d Cir. 1976) cert. denied 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798, unless the officer, director, or employee has a personal stake in the illegal activities separate and distinct from that of the corporation. *Greenville Publishing Company, Inc. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974). In the present case, the allegations of the complaint are directed toward the activities of Chico Importers, Inc., Uniflora Overseas Florida, Inc. and Holiday Foliage, Inc. Plaintiff asserts no independent interest of Fritz Tempelhof in the alleged dumping aside from the interest arising out of his majority ownership of the stock of the corporations involved. This is not the type of separate and distinct stake to which the exception is directed. Accordingly, Fritz Tempelhof should not be a party to this suit and his motion to dismiss will be granted.

In view of these rulings on defendants' motion, the Court will set a date for the recommencement of the hearing on plaintiff's motion for a preliminary injunction. It will be so ordered.