**WESTERN CONCRETE STRUCTURES CO., INC., Plaintiff-Appellant,**

v.

**MITSUI & COMPANY (U.S.A.), INC., Mitsui Bussan Kabushiki Kaisha, VSL Corporation, Inc., Shinko Wire Co., Ltd., and Losinger AG, Defendants-Appellees.**

**No. 83-2464.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 8, 1984.

Decided May 17, 1985.

Sneed, Circuit Judge, filed an opinion concurring in part and dissenting in part.

W. Robert Spensley, Vincent J. Belusko, Spensley, Horn, Jubas & Lubitz, Los Angeles, Cal., for plaintiff-appellant.

Michael C. Kelly, Kadison, Pfaelzer, Woodard, Quinn & Rossi, Los Angeles, Cal., James Hunt, McCutchen, Doyle, Brown & Enersen, Robert A. Rosenfeld, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendants-appellees.

Before BROWNING, Chief Judge, DUNIWAY and SNEED, Circuit Judges.

DUNIWAY, Circuit Judge:

Western Concrete Structures alleged in its second amended complaint that the defendants conspired to import steel strand from Japan at prices below the lawful price, so that VSL could underbid its competitors in this country, including Western, in the post-tensioning concrete industry.

The district court entered a judgment dismissing all of Western's claims. We reverse in part and affirm in part.

## I. *Facts.*

In reviewing the district court's dismissal for failure to state a claim, we must treat the facts alleged in the complaint as true. *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 9 Cir., 1983, 712 F.2d 404, 406. The complaint's allegations are these:

Post-tensioning is a construction process used in building bridges, nuclear reactors, and other concrete structures, that involves the stretching of steel strand tendons within concrete slabs or girders. The cost of steel strand is approximately 55% of the direct cost of post-tensioning, while the profit margin is approximately 8%. Thus, the price of steel strand significantly affects a post-tensioning firm's competitive bidding position.

Plaintiff Western Concrete Structures and defendant VSL are California corporations that compete in the post tensioning business. VSL is a subsidiary of defendant Losinger, a Swiss firm. Defendants Mitsui (Japan), a Japanese trading company, and its American subsidiary Mitsui (U.S.A.) supply VSL with steel strand manufactured in Japan by defendant Shinko Wire.

In early 1978, the United States Department of the Treasury implemented import restrictions for steel mill products, including steel strand. The restrictions established published trigger prices, based on the production costs of the most efficient domestic manufacturers, below which importation could trigger government action under the Antidumping Act of 1921, 19 U.S.C. § 160 *et seq., as amended id.* § 1673 *et seq.* In 1982, VSL and Mitsui (U.S.A.) were indicted for, and pleaded guilty to, importing steel strand at prices below trigger prices, in violation of the Antidumping Act.

Western's action is for treble damages under the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 4 of the Clayton Act, *id.* § 15(a), under the Wilson Tariff Act, *id.* § 8, under the Antidumping Act of 1916, *id.* § 72 ¶ 3, and state law against unfair competition. Western alleges that the defendants conspired to import steel strand into the United States at prices below those permitted by the import restrictions, with the intent of restraining competition in the post-tensioning industry and thus helping VSL to attempt to monopolize that industry. However, Western expressly disclaimed that it alleges or claims "predatory" pricing by the defendants, that is, pricing below the seller's marginal or average variable or average total cost. *See Transamerica Computer Co. v. IBM Corp.*, 9 Cir., 1983, 698 F.2d 1377, 1384–88; *Zoslaw v. MCA Distributing Corp.*, 9 Cir., 1982, 693 F.2d 870, 887–88. The key allegation is that the conspiracy enabled VSL to obtain steel strand at prices 15% to 20% lower than the price at which VSL's competitors, including Western, could legally purchase steel strand from Mitsui, from other importers, or from domestic suppliers. VSL consequently increased its market share to about 70%. VSL's ability to underbid forced four out of five of its "substantial" competitors in the bridge post-tensioning business out of the market, and forced all three existing "substantial" commercial post-tensioning competitors out of the market. Western's share of the post-tensioning bridge market dropped from 13% to 5%, and its share of the commercial post-tensioning business dropped from about 15% to 4% in a year, and Western then left that market.

In considering appellant's claims, we bear in mind that the judgment was based on a determination under Rule 12(b)(6) F.R. Civ.P. that the complaint does not "state a claim upon which relief can be granted." No answer has been filed; no discovery has occurred; no trial has taken place. Only if it is clear that a viable claim cannot be stated should a judgment of dismissal be entered on a Rule 12(b)(6) motion.

## II. *Sherman Act: Restraint of Trade and Monopolization.*

The district court ruled that Western failed to state a claim under the Sherman Antitrust Act and the Clayton Act, 15

U.S.C. §§ 1, 2, and 15, because it did not allege facts amounting to anti-competitive conduct or antitrust injury. The court held that the alleged purchase and sale agreements for steel strand at below the Trigger Price Mechanism level and in violation of the Antidumping Acts were not, without more, anticompetitive or predatory within the meaning of 15 U.S.C. §§ 1 and 2. Western argues that the intent and purpose of the defendants' conspiracy to violate the import price controls was to suppress and restrain competition, a violation of § 1, and to help VSL to monopolize the post-tensioning industry, a violation of § 2. Western alleges that the defendants' conduct caused injury to competition because the competitors of VSL could not meet VSL's bid price or negotiated price for post-tensioned projects, and consequently were driven out of the market.

■ Whether the alleged acts were anti-competitive and predatory within the meaning of the antitrust laws is a question of law that we review *de novo. Foremost Pro Color v. Eastman Kodak Co.*, 9 Cir., 1983, 703 F.2d 534, 539. We note, too, that summary dismissals of antitrust actions are disfavored. *Clayco Petroleum, supra,* 712 F.2d at 406.

Many decisions speak of "the anti-trust laws" or "the Sherman Act" without distinguishing between section 1 and section 2 of that Act. However, there is a difference, and in this case that difference may be material. We therefore consider the two sections separately.

A. *Section 1 of the Sherman Act.*

Section 1 prohibits "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations...." Thus the first thing that the pleader must allege is that there is a "contract, combination ... or conspiracy." The complaint does allege such a conspiracy.

The second requirement is that the conspiracy must be "in restraint of trade or commerce." That, too, is alleged. How-

ever, defendants argue, and the trial judge agreed, that price cutting does not violate section 1, unless it is "predatory" in the sense that it is below cost. Our cases say that this is usually, but not always correct. There are exceptions. See our discussion of this phase of the law in *Transamerica Computer Co., Inc. v. IBM Corp.*, 9 Cir., 1983, 698 F.2d 1377, 1387. "First, this court has already recognized that prices exceeding average total cost might nevertheless be predatory in some circumstances." And again: "A rule based exclusively on cost forecloses consideration of other important factors, such as intent, market power, market structure, and long-run behavior in evaluating the predatory impact of a pricing decision."

■ Here, intent to injure VSL's competitors and to drive them out of the market is specifically alleged. Also alleged is the peculiar market structure of the post-tensioning business. It is a protected market, in that steel strand may not lawfully be imported at prices below a fixed price. Domestic concerns cannot lawfully buy imported steel strand below that price and domestic sellers will not sell steel strand below that price. It is alleged that the conspirators arranged to supply VSL with imported steel strand at a price below what VSL's competitors could lawfully pay and that the intended and actual result was to enable VSL to put those competitors, including Western, at a competitive disadvantage, and drive most of them out of the post-tensioning business, including Western as to one part of the market. We hold that these allegations being this case within the exception that we articulated in *Transamerica Computer.* Here, the price cutting was not "pro-competitive" as most price cutting is. Rather, it was intended to be, and was, anti-competitive under the unique conditions of the relevant market.

The cases on which the appellees relied are not to the contrary. The first is *In re Japanese Electronic Products Antitrust Litigation*, 3 Cir., 1983, 723 F.2d 238, affirming in part *Zenith Radio Corp. v. Mat-*

*sushita Electric Industries Co.,* E.D.Pa., 1981, 513 F.Supp. 1100. Defendants rely on a ruling in favor of Sears, one of the defendants. Here is what the court said:

There is evidence from which it could be found that Sears negotiated prices from Sanyo and Toshiba substantially lower than the minimum prices fixed in the MITI-sponsored minimum price agreement, and took steps, over a long period, to conceal these dumping prices from the Japanese government and the United States Customs Service. While that activity, if it occurred, may have been illegal, it was clearly consistent with Sears' economic interest as a retailer. There is no evidence that Sears was aware of retail price stabilization in Japan, or of the five-company rule, or that the suppliers with which it dealt were acting in concert with respect to the evasion of the minimum prices agreed upon with MITI.

723 F.2d at 312.

As the last sentence shows, the essence of the decision is that Sears was not a conspirator.

It is true that elsewhere in the *Japanese Electronic* opinion there is language that selling in this country at prices below the prices which the Japanese companies charged in Japan does not violate section 1 of the Sherman Act, 723 F.2d at 305. But there is more here. In the same opinion, 723 F.2d at 311, the court said: "We hold that a finding of a conspiracy to sell at artificially high prices in Japan while at the same time selling at artificially low prices in the United States would support liability to NUE and Zenith under section 4 of the Clayton Act, ..."

The second case relied on by the appellees is *Knuth v. Erie-Crawford Dairy Cooperative Association,* 3 Cir., 1972, 463 F.2d 470. In that case, however, the court determined that the charged conspiracy had not been proved.

Plaintiff argues that the conscious parallel action among all of the defendants was sufficiently inferable from the evidence that the existence of a conspiracy was a jury question. No specific evidence is referred to, and our own review of the record discloses no evidence tending to show that any handler was even aware of the price arrangement of any other. Evidence from which a conspiracy may be inferred is simply absent. *Id.* at 476.

The third case is *United States v. Citizens & Southern National Bank,* 1975, 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41. The facts there are so different from the facts here that the case is hardly relevant. Moreover, it was not a pleading case. The court did not suggest, much less say, that a conspiracy to circumvent anti-competitive government restrictions, to the damage of competitors, can never be a violation of Section 1 of the Sherman Act.

We hold that the complaint alleges a sufficient claim under Section 1.

B. *Section 2 of the Sherman Act.*

Section 2 provides, in pertinent part:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, ...

Under this section, whether or not conspiracy is charged, there must be a specific objective—to "monopolize, or attempt to monopolize." This differs from section 1, which requires a conspiracy, but does not require monopolizing or attempting to monopolize. In this case the charge is that the defendants conspired to enable VSL to monopolize the post-tensioning business in this country. The means used were to reduce the price of steel strand to VSL, and thereby VSL's price for post-tensioning, to a point where Western and other competitors of VSL are driven from the market. Both an attempt to do so and actually doing so are charged.

Attempt to monopolize and actual monopolization involve, among other things, intentional predatory or anticompet-

itive conduct. *See Northrop Corp. v. McDonnell Douglas Corp.*, 9 Cir., 1983, 705 F.2d 1030, 1057–58. This element of a section 2 claim encompasses more than the parallel element of a section 1 claim. *Calculators Hawaii, Inc. v. Brandt, Inc.*, 9 Cir., 1983, 724 F.2d 1332, 1339; *California Computer Products, Inc. v. IBM Corp.*, 9 Cir., 1979, 613 F.2d 727, 737. Conduct that is competitive in a section 1 context may be predatory or anticompetitive in a section 2 context, because monopolization is, in effect, being so competitive as to destroy competition. Thus, while illegal price-cutting is usually not a restraint of trade when done for competitive purposes in a competitive market, it is predatory if the purpose is to monopolize the relevant market. *See United States v. Columbia Steel Co.*, 1948, 334 U.S. 495, 531–32, 68 S.Ct. 1107, 1126, 92 L.Ed. 1533 ("even though the restraint effected may be reasonable under § 1, it may constitute an attempt to monopolize forbidden by § 2 if a specific intent to monopolize may be shown").

The cases cited by defendants in support of their argument that illegal price-cutting is not anticompetitive conduct under section 1 did not involve allegations comparable to Western's claim that the purpose of the dumping was to allow VSL to monopolize the American post-tensioning industry. Thus, they do not support an argument that such conduct is not predatory or anti-competitive under section 2.

■ Western alleged that VSL violated the import restrictions in order to, and that it did, underbid its post-tensioning competitors harm those competitors, and enhance its long-term position in the market. Western alleged that the conspiracy resulted in VSL increasing its market share to 70% or more, while correspondingly decreasing the market shares of its rivals, and that several firms were forced out of the market. Western alleged that the defendants intended to create a monopoly by means of other than fair competition, specifically by importing steel strand at illegally low prices. This would be predatory conduct. *See William Inglis & Sons Baking Co. v.*

*ITT Continental Baking Co.*, 9 Cir., 1981, 668 F.2d 1014, 1030–31, ("Such conduct is not true competition.... Its purpose is to create a monopoly by means other than fair competition").

Western's allegation that the defendants agreed that Mitsui (U.S.A.) would sell Shinko Wire's steel strand to VSL at a price substantially lower than it offered to Western and other post-tensioning competitors, for the purpose of enabling VSL to monopolize the post-tensioning industry, if borne out, would establish a violation of § 2. Therefore, it is sufficient to survive a motion to dismiss.

■ We also conclude that the alleged illegal conduct resulted in antitrust injury. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 1977, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701. Western alleged that the defendants' conspiracy was intended to and did injure the post-tensioning market, in which Western competed, by creating a monopoly. Thus, Western's injury was "inextricably intertwined" with the injury to the market that the conspiracy sought to inflict. *See Associated General Contractors v. California State Council of Carpenters*, 1983, 459 U.S. 519, 538, 103 S.Ct. 897, 909, 74 L.Ed.2d 723; *Blue Shield of Virginia v. McCready*, 1982, 457 U.S. 465, 483–84, 102 S.Ct. 2540, 2550–51, 73 L.Ed.2d 149.

### III. *The Wilson Tariff Act.*

■ Western alleged as a separate claim that the defendants' conduct also violated the Wilson Tariff Act, 15 U.S.C. § 8. That Act prohibits

Every combination, conspiracy, trust, agreement or contract ... between two or more persons or corporations, either of whom ... is engaged in importing any article from any foreign country ... when such combination [etc.] ... is intended to operate in restraint of ... trade or ... competition in ... trade or commerce or to increase the market price ... in ... the United States of any article or articles imported or intended to be imported into the United States, or of

any manufacture into which such imported article enters or is intended to enter.

The described conduct is analogous to that proscribed in § 1. *See Zenith Radio,* 513 F.Supp. at 1164, *aff'd* 723 F.2d at 306, 316; *Timberlane Lumber Co. v. Bank of America N.T. & S.A.,* 9 Cir., 1976, 549 F.2d 597, 600 n. 1. However, it does not, on its face, include monopolizing or attempting to monopolize. The complaint does state a claim under § 8, for the same reasons that it states a claim under § 1.

### IV. *The 1916 Antidumping Act.*

The district court dismissed Western's action for violation of the 1916 Antidumping Act, 15 U.S.C. § 72, holding that Western lacked standing to sue under that statute. The court found that the history of the Act suggested that although a direct domestic competitor of an alleged dumper (such as a domestic steel strand producer) might have a private right of action, a competitor of a purchaser from the alleged dumper (such as Western) does not.

Western argues that the language of the Act plainly confers standing:

> *Any person injured* in his business or property by reason of any violation of, or combination or conspiracy to violate, this section, may sue therefor in the district court ... and shall recover threefold the damages sustained, and the cost of the suit, including a reasonable attorney's fee.

15 U.S.C. § 72 (emphasis added). The few cases that have addressed the extent of standing, however, demonstrate that the meaning of the language is not plain. *Compare Jewel Foliage Co. v. Uniflora Overseas Florida, Inc.,* M.D.Fla., 1980, 497 F.Supp. 513, 516–17 (importer has standing to sue a competing importer; standing not limited to domestic manufacturers), *with Schwimmer v. Sony Corp. of America,* E.D.N.Y., 1979, 471 F.Supp. 793, 797 (domestic wholesale distributer of imported products lacks standing; standing limited to domestic manufacturers injured by alleged dumping); *accord Bywater v. Matsushita Electric Industrial Co.,* S.D.N.Y., 1971, CCH Trade Reg.Rep. ¶ 73,759.

We must construe the grant of standing to "any person injured" not only in the light of its literal expansiveness and its meaning in the context of other statutes, such as the Clayton Act, 15 U.S.C. § 15, but in its specific context. The 1916 Act prohibits import or sale at below market prices "with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States or of restraining or monopolizing any part of trade and commerce in such articles in the United States." 15 U.S.C. § 72. Thus, the express purpose of the Act is to protect domestic industries from dumping by their foreign competitors. In every reported case, the statute has been applied or restricted to domestic producers (or importers, in *Jewel Foliage, supra,* where there were no domestic producers of wide-leaf comador foliage) *of the dumped good,* prohibiting restraint or monopolization of trade *in the dumped good.* This is faithful to the historical purpose of the 1916 Act to protect American producers from foreign competitors, specifically established European manufacturers. *See Jewel Foliage,* 497 F.Supp. at 516–17; *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* E.D.Pa., 1980, 494 F.Supp. 1190, 1221; *Schwimmer,* 471 F.Supp. at 797; H.R.Rep. No. 922, 64th Cong., 1st Sess. 9–10 (1916).

■ Here, the claim is that defendants evaded the trigger price mechanism that protected the domestic steel industry. But Western is a member of the post-tensioning industry, not of the steel industry, and Western alleged that the defendants conspired to restrain and monopolize post-tensioning, not trade in steel strand. Violation by import and sale of steel strand at below market prices of antidumping laws intended to promote the domestic steel industry does not give rise to an action under the 1916 Antidumping Act by a member of the post-tensioning industry. We therefore conclude that the district court properly limited standing under the 1916 Act to domestic competitors of the alleged dumper, ·denying standing to a domestic competitor

of a domestic buyer of allegedly dumped goods.

### V. *Conclusion.*

We affirm the judgment as it relates to the 1916 Anti-dumping Act.

We reverse the judgment as it relates to Sections 1 and 2 of the Sherman Act and the Clayton Act, and as it relates to the Wilson Tariff Act.

Affirmed in part, reversed in part, and remanded, plaintiff to recover its costs.

SNEED, Circuit Judge, concurring in part and dissenting in part:

I concur in the opinion of the court in all respects except that part, II.A, which holds that a violation of Section 1 of the Sherman Act has been alleged.

Section 1 of the Sherman Act forbids every "contract, combination ..., or conspiracy, in restraint of trade or commerce." I agree that the complaint alleges a conspiracy. I do not believe, however, that the alleged conspiracy was "in restraint of trade or commerce." The majority reasons that the required element of restraint existed because the alleged object of the conspiracy was to drive VSL's competitors, including Western, out of business. I believe that such a motive renders the alleged conduct a conspiracy to monopolize or an attempt to monopolize within the meaning of Section 2 of the Sherman Act, but not a restraint of trade within the meaning of Section 1.

The improper conduct alleged in this case is a conspiracy to sell at prices below those that other competitors, acting within the law, could offer. This is no more and no less than a form of predatory pricing. The only difference between the conduct alleged in this case and ordinary predatory pricing is that here it is the law, rather than costs, that prevents the defendant's competitors from matching the defendant's price.

Our cases have always treated predatory pricing as a violation of Section 2, not Section 1. *See, e.g., RFD Publications, Inc. v.* *Oregonian Publishing Co.,* 749 F.2d 1327 (9th Cir.1984); *Transamerica Computer Co. v. International Business Machines Corp.,* 698 F.2d 1377 (9th Cir.1983); *California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727, 739–43 (9th Cir.1979); *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848 (9th Cir.1977). I have found no case in this circuit that has extended Section 1 coverage to a conspiracy to engage in predatory pricing. One case from the Third Circuit, *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238 (3d Cir.1983), concerned a conspiracy to fix prices in one market while selling products at unlawfully low prices in another market. The court found that one defendant, Sears, had conspired with its supplier to import products at unlawfully low prices, but had not been part of the price-fixing conspiracy. Sears was held *not* to have violated Section 1. *See id.* at 312–13.

This paucity of authority should caution us not to leap to the conclusion that a Section 1 violation has been alleged in this case. Ordinarily, an arrangement between a seller and his supplier designed to improve the seller's position in his market is not a violation of the Sherman Act. The purpose of competition from the merchant's point of view is to expand his market without regard to whether he thereby shrinks that of another merchant. The Sherman Act was designed to foster precisely that kind of activity.

The activity becomes a matter of concern under the Sherman Act only when the seller threatens to monopolize his market. Thus, Section 2 provides an appropriate test of the lawfulness of the conduct alleged. The analysis under Section 2 is straightforward, unstrained, and easy to grasp.

The majority's intent in declaring such an arrangement to be a "restraint of trade" under Section 1 is unclear. If the arrangement is unlawful under Section 1 only when it threatens to monopolize the market, then Section 1 simply duplicates Section 2 in this context. If, however, Sec-

tion 1 is applicable even when the arrangement does not threaten to result in monopoly, then Section 1 becomes a "code of fair competition" that brings under the antitrust laws any unfair or unlawful scheme by which a seller seeks to improve his position in the market at the expense of his rivals.[1] Antitrust law has always had a tendency to drift in this direction, but it is a drift to which I do not wish to add my weight.

The majority's interpretation of Section 1 could be far-reaching. For example, a business linked in some advantageous way with organized crime might well be made an antitrust target by its competitors. Or a supplier's violation of the minimum wage laws, when known to his purchaser, might render the latter subject to an antitrust suit by a competitor. Or a knowing purchaser from one who is violating the antitrust laws might also be liable under Section 1. Perhaps the majority intends to reach this far. Perhaps not. Not knowing whether they do or not, I respectfully dissent from Part II.A.

Schroeder, Circuit Judge, concurred and dissented and filed opinion.

1. True, the plaintiff must allege a conspiracy of some sort, but we know from our experience in the criminal law that such an allegation is easily made and proven.