**ISRA FRUIT LTD., Plaintiff,**

v.

**AGREXCO AGRICULTURAL EXPORT COMPANY LIMITED and Agrexco (U.S.A.) Ltd., Defendants.**

No. 85 CIV. 0909 (PKL).

United States District Court,
S.D. New York.

March 13, 1986.

Parker, Auspitz, Neesemann & Delehanty P.C., New York City (Jack C. Auspitz, Martin S. Himeles, Jr., of counsel), for plaintiff.

Willkie, Farr & Gallagher, New York City (David C. Foster, James J. Calder, Kevin O'Regan, William J. Borner, of counsel), for defendants.

## OPINION

LEISURE, District Judge:

In this action plaintiff, Isra Fruit Ltd. ("Isra Fruit"), alleges violations of, *inter alia*, Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 2(a) of the Clayton Act as amended by the Robinson-Patman, 15 U.S.C. § 13(a), the Anti-Dumping Act of 1916, 15 U.S.C. § 72, as well as pendent state law claims for breach of contract, unjust enrichment, misappropriation of trade secrets and unfair competition. Defendants, Agrexco Agricultural Export Company Limited and Agrexco (U.S.A.) Ltd. (hereinafter collectively referred to as "Agrexco" or defendant), have moved pursuant to Fed.R.Civ.P. 12(b)(6) and 56 to dismiss portions of the complaint.

Isra Fruit and Agrexco were competitors in the business of importing fresh Israeli produce into the United States. Plaintiff

alleges that it entered the market as Agrexco's only competitor and that Agrexco unlawfully drove it from the market, consequently restoring defendant's monopoly. More specifically, the complaint alleges that defendant succeeded in reacquiring the monopoly by selling produce at prices below cost; engaging in discriminatory pricing; inducing plaintiff to enter into an agreement to form a jointly owned company and then, after plaintiff had discontinued its operations, breaching the agreement; and misappropriating plaintiff's trade secrets.

■ Agrexco moves to dismiss the Sherman Act § 2 claims on the basis that the joint venture agreement itself was an agreement to monopolize the market and therefore plaintiff did not suffer injury "of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Agrexco contends that plaintiff's antitrust claims are based on defendant's refusal to proceed with an agreement to monopolize a market and pool the resulting monopoly profits with plaintiff. Defendant's theory misconstrues the thrust of the complaint, which is that Isra Fruit entered into the joint venture agreement not to monopolize the market but, rather "to make the best of a bad situation." *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 140, 88 S.Ct. 1981, 1985, 20 L.Ed.2d 982 (1968). Moreover, the fact that plaintiff stood to gain if the agreement were carried out does not deprive it of the right to resort to the antitrust laws. If "it is shown that the plaintiff did not aggressively support and further the monopolistic scheme ... his understandable attempts to make the best of a bad situation should not be a ground for completely denying him the right to recover which the antitrust acts give him." *Id.* Defendant ignores the complaint's allegations that its deliberate anticompetitive activities drove plaintiff to enter into the joint venture agreement, thus eliminating competition. The instant case is thus distinguishable from *Brunswick*, which holds that there can be no antitrust injury where the activities complained of "preserved competition." 429 U.S. at 488, 97 S.Ct. at 697.

The rationale for allowing a party to assert an antitrust claim despite the existence of unclean hands was summarized by Justice White in his concurring opinion in *Perma Life Mufflers.*

When those with market power and leverage persuade, coerce, or influence others to cooperate in an illegal combination to their damage, allowing recovery to the latter is wholly consistent with the purpose of § 4 [of the Clayton Act, 15 U.S.C. § 15], since it will deter those most likely to be responsible for organizing forbidden schemes.

392 U.S. at 145, 88 S.Ct. at 1988 (White, J., concurring). This statement provides guidance pertinent to the circumstances portrayed by the complaint in this action. Contrary to defendants' contention, plaintiff's antitrust claims do not seek to enforce the joint venture agreement, but rather to utilize the antitrust laws as redress for defendants' use of monopoly power to drive plaintiff out of business. The joint venture, according to the complaint, was an instrument employed by defendants to achieve that end. Under the teaching of *Perma Life Mufflers*, plaintiff's participation in that agreement does not bar it from asserting an antitrust claim.

■ The allegation that plaintiff was forced to enter into the joint venture agreement by reason of defendant's activities distinguishes this case from cases such as *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229 (6th Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981), where the court held that a corporation that sold its assets to a competitor did not allege *Brunswick* antitrust injury upon breach of the purchase agreement, because the corporation had voluntarily withdrawn from the market. Any injury incurred was related to breach of the acquisition agreement, not to any reduction of competition in the marketplace. *Chrysler Corp.*, 643 F.2d at 1235; *see also McDonald v. Johnson &*

*Johnson,* 722 F.2d 1370, 1375–76 (8th Cir. 1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984). In this case, it is alleged that the joint venture agreement was entered into by plaintiff as a last gasp effort to survive defendant's predatory and monopolistic tactics, which had already driven plaintiff to the brink of elimination from competition. In other words, defendant's alleged anticompetitive acts gave rise to the agreement. *McDonald,* 722 F.2d at 1378 (antitrust standing would exist if it were alleged that a competitor "forced or attempted to force competitors to sell out to them by threats or other predatory conduct"). The use of the joint venture agreement to obtain plaintiff's withdrawal from competition purportedly occurred in the context of defendant's prior anticompetitive activities. Unlike the circumstances presented in *Chrysler,* the joint venture agreement was part of an ongoing course of alleged monopolistic activity. *Schine Chain Theatres, Inc. v. United States,* 334 U.S. 110, 119, 68 S.Ct. 947, 952, 92 L.Ed. 1245 (1948) (inference that agreement was used as a "weapon ... in an effort to monopolize" was justified "against the backdrop of ... other monopolistic practices"). Plaintiff's alleged injury thus stems "from that which makes defendant['s] acts unlawful," *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697, in this case, an intent to monopolize the market for fresh Israeli produce. The joint venture agreement being merely one step in a scheme to monopolize, it is proper to include it as a basis for pleading the antitrust causes of action. *Schine Chain Theatres,* 334 U.S. at 119, 68 S.Ct. at 953 ("agreements were additional weapons" used to achieve monopoly). Accordingly, the motion to dismiss the first two claims is denied.

Next, Agrexco moves to dismiss Isra Fruit's seventh, eighth and ninth causes of action, which allege state law claims for breach of the alleged joint venture agreement, breach of an alleged profit sharing agreement and unjust enrichment. It is averred in the seventh and eighth causes of action that the joint venture agreement was used to induce plaintiff to discontinue its operations by promising to share Agrexco's interim profits. It is alleged in the ninth cause of action that plaintiff discontinued its business and rendered assistance to Agrexco during the 1983–84 growing season, for which plaintiff was never paid, thereby unjustly enriching defendants. Defendants move to dismiss all three claims on the grounds that the underlying contracts are illegal under the federal antitrust laws and court enforcement would serve to compel illegal conduct. *See Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 79, 82, 102 S.Ct. 851, 857, 859, 70 L.Ed.2d 833 (1982).

■ Assuming that plaintiff prevails on its claim that there is a discrete United States market for fresh Israeli produce, defendants may be correct that the joint venture agreement and its related sub-agreements and obligations violate the antitrust laws and are unenforceable. But this does not require the Court to dismiss the state law breach of contract claims at this juncture. Pendent jurisdiction exists over the state law claims since they and the antitrust and price discrimination claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The evidence needed to establish the federal claims is, to a significant degree, the same evidence needed to establish the contract claims.

■ In the event that plaintiff is unable to prove the existence of a separate market for fresh Israeli produce and therefore not prevail on the anti-trust claims, the contract claims would provide an alternative basis for plaintiff to seek recovery. The Federal Rules of Civil Procedure permit the pleading of inconsistent claims. Fed.R. Civ.P. 8(e)(2) (a complaint may "state as many separate claims ... as [plaintiff] has regardless of consistency"). It is therefor proper for plaintiff to pursue simultaneously its breach of contract and unjust enrichment claims notwithstanding their actual or potential inconsistency with the antitrust claims. This analysis is consistent with the

requirement that no motion to dismiss under Rule 12(b)(6) should be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Meyer v. Oppenheimer Management Corp.*, 764 F.2d 76, 80 (2d Cir.1985). The court is "required to read the complaint with great generosity on a motion to dismiss." *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555 (2d Cir.1985). Consequently, "all facts and all inferences reasonably deducible therefrom are to be construed in favor of the plaintiff." *Budco, Inc. v. The Big Fights, Inc.*, 594 F.2d 900, 902 (2d Cir.1979); *see also Dahlberg v. Becker*, 748 F.2d 85, 88 (2d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). The motion to dismiss the seventh, eighth and ninth causes of action consequently is denied.

The fifth and sixth causes of action set forth claims arising out of alleged violations of the Anti-Dumping Act of 1916, 15 U.S.C. § 72 ("Anti-Dumping Act" or "Act").[1] The Anti-Dumping Act of 1916 forbids the importation and sale of foreign goods in the United States at less than their market value in the country of their origin or other foreign market. Defendant argues that Isra Fruit lacks standing to allege a claim under the Act since it is an importer of foreign goods, not a domestic manufacturer. *See Schwimmer v. Sony Corp. of America*, 471 F.Supp. 793, 797

(E.D.N.Y.1979), *aff'd*, 637 F.2d 41 (2d Cir. 1980). In *Schwimmer*, a domestic distributor of Japanese consumer electronic goods complained that Sony was selling its products to another American distributor at prices lower than those charged to Sony's American subsidiary, from who plaintiff purchased its inventory. The court held that plaintiff lacked standing to allege an anti-dumping claim since it was neither a domestic manufacturer nor a direct competitor of the dumper. 471 F.Supp. at 796–97. Similarly, in a case relied upon by the *Schwimmer* court, former employees of an American television manufacturer, put out of business because of alleged dumping by Japanese television manufacturers, lacked standing to assert an anti-dumping claim since their loss was an incidental, rather than a direct result of the dumping activity. *Bywater v. Matsushita Electric Industrial Co.*, 1971 Trade Cases (CCH) ¶ 73,759 at 91,202–03 (S.D.N.Y.1971).

■ Generally, the applicability of the Act has been restricted to domestic producers of the dumped goods. *Western Concrete Structures Co. v. Mitsui & Co. (U.S. A.)*, 760 F.2d 1013, 1019 (9th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). But, taking as true plaintiff's allegation that there is a discrete market for fresh Israeli produce, there are no domestic producers of the dumped goods. In a similar case, an importer of the dumped goods was held to have standing to assert a claim under the anti-dump-

---

1. 15 U.S.C. § 72 provides:

It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production, or of other foreign countries to which they are commonly exported after adding to such market value or wholesale price, freight duty, and other charges and expenses necessarily incident to the importation and sale thereof in the United States: Provided, That such act or acts be done with the intent of

destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States.

. . . .

Any person injured in his business or property by reason of any violation of, or combination or conspiracy to violate, this section, may sue therfor in the district court of the United States for the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages sustained, and the cost of the suit, including a reasonable attorney's fee.

ing law. *Jewel Foliage Co. v. Uniflora Overseas Florida, Inc.*, 497 F.Supp. 513, 516–17 (M.D.Fla.1980) (no domestic producers of wide-leaf comador foliage). Although the initial purpose of the Anti-Dumping Act of 1916 was to protect domestic manufacturers from dumping by their European competitors, it "is perhaps used to attack different evils today." *Schwimmer,* 471 F.Supp. at 797. The legislative history indicates that "Congress intended the 1916 Act to extend to importers the same price discrimination law applicable to domestic commerce." *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 494 F.Supp. 1190, 1226 (E.D.Pa.1980). In order to give effect to the aims of fostering competition in the sale of goods and services in the United States, *Jewel Foliage,* 497 F.Supp. at 517, it is appropriate to confer standing on an importer of a foreign good where, as it is alleged in this case, there are no domestic producers of the dumped goods.

> If the dumping of foreign products on the American market adversely affects the domestic manufacturers, it also harms other domestic businesses engaged in the importation of those products. The business of those importers who are not engaged in dumping activities will be reduced just as the business of the domestic manufacturers will be. To say that the manufacturers can sue to vindicate their losses, but that the importers cannot, does not fairly perceive the consequences of the illegal activity. The harm to the markets of the United States being the same, the importer should not be denied the right to avail itself of the Act's protections.

*Id.* at 517. In this case, plaintiff alleges that it was a direct competitor of the alleged dumper. The complaint also alleges that defendants acted with intent to restrain and monopolize the American market for the importation and distribution of fresh Israeli produce. Based upon these allegations, any injury plaintiff may have incurred would have been a direct, not an incidental result of Agrexco's alleged dumping activities. Indeed, it can be fairly inferred, based upon the allegations of the complaint, that plaintiff was the target of defendant's dumping activities. For these reasons defendant's motion to dismiss the fifth and sixth causes of action for failure to state a claim is denied.

The tenth cause of action sets forth claims for misappropriation of trade secrets and unfair competition. Plaintiff alleges that when it discontinued its operations, it provided Agrexco with the names and information concerning its customers. Plaintiff claims that the customer list was more than a publicly available list of produce retailers and wholesalers, but was limited to the few such dealers who it had determined "were willing to carry comparatively expensive Israeli produce." The information divulged allegedly included details about the buying patterns and needs of plaintiff's customers, such as the amounts and types of produce they had purchased, their preferences with respect to size and ripeness of produce and other similar information not previously known to Agrexco. Agrexco was also told the names of plaintiff's customer contacts.

Defendant has moved for summary judgment dismissing these claims, asserting that the information supplied to defendant does not constitute a trade secret. Defendant argues that the information constituted matters of public knowledge or of general knowledge in the industry, and as such is not subject to misappropriation. Generally, customer lists can be protected as trade secrets only "where the customers are [not] readily ascertainable outside the ... business as prospective users or consumers of the ... services or products." *Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 392, 328 N.Y.S.2d 423, 427, 278 N.E.2d 636, 639 (1972). *See generally Town & Country House & Home Service, Inc. v. Newberry,* 3 N.Y.2d 554, 170 N.Y. S.2d 328, 147 N.E.2d 724 (1958). However, such information may be considered protectible when it is divulged as part of the sale of a business and is misused, or where more than just a list of names is involved.

Heyman v. AR. Winarick, Inc., 325 F.2d 584, 590 (2d Cir.1963). In *Heyman,* the Court held that information concerning the marketing of plaintiff's product, advertising efforts and monthly orders "should have been classified as a trade secret." *Id.* at 590; *see also Noma Lites, Inc. v. Lawn Spray, Inc.,* 222 F.2d 716, 717 (2d Cir.1955) (per curiam) (planned promotional campaign found to be a trade secret); *Arnold's Ice Cream Co. v. Carlson,* 330 F.Supp. 1185, 1187 (E.D.N.Y.1971); *Velo-Bind, Inc. v. Scheck,* 485 F.Supp. 102, 104, 105, 107 (S.D.N.Y.1979). In the context of former employees soliciting customers of a former employer, however, such information does not amount to a trade secret. *Reed, Roberts Associates v. Strauman,* 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 680, 353 N.E.2d 590, 593 (1976). Different considerations may apply where, as here, a "breach of trust resulting in commercial piracy" may be involved. 40 N.Y.2d at 309, 386 N.Y. S.2d at 681, 353 N.E.2d at 594.

The arguments presented by the parties have raised material questions of fact concerning the exact nature of the information given as well as defendant's prior relationships with plaintiff's customers and the methods plaintiff used to gather such information. Although both parties have submitted affidavits on these issues, plaintiff argues that it has not had the opportunity to conduct discovery with respect to same, such as deposing the witnesses whose affidavits were submitted in support of the motion in order to explore the matters asserted therein. These considerations compel the Court, at this time, to deny defendant's motion for partial summary judgment. Fed.R.Civ.P. 56(f).

### Conclusion

The motions to dismiss for failure to state a claim upon which relief can be granted and for partial summary judgment are denied.

**SO ORDERED.**