**GENEVA STEEL COMPANY, Plaintiff,**

v.

**RANGER STEEL SUPPLY CORPORATION and Thyssen Incorporated, Defendants.**

No. 96–C–774 B.

United States District Court,
D. Utah,
Central Division.

Sept. 19, 1997.

Clark Waddoups, Salt Lake City, UT, Carolyn McHugh, Salt Lake City, UT, Charles Owen Verrill, Jr., Washington, DC, for Geneva Steel Co.

Mark O. Van Wagoner, Salt Lake City, UT, Thomas R. Barton, Salt Lake City, UT, Kermit W. Almstedt, Washington, DC, Richard G. Parker, Washington, DC, for Ranger Steel Supply Corp.

Kenneth Yeates, Salt Lake City, UT, David Ettinger, Detroit, MI, Gail T. Cumins, New York, NY, for Thyssen Inc.

## OPINION & ORDER

BENSON, District Judge.

This case is before the court pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on Defendants' Motion to Dismiss for failure to state a claim upon which relief can be granted. Plaintiff alleges in its Complaint that Defendants violated the Anti-dumping Act of 1916, 15 U.S.C. § 72, by systematically selling steel purchased abroad to customers in the United States at prices substantially below the actual market value of the steel in the countries where the steel was made. Plaintiff alleges that these below-cost sales were made with the intention on the part of the Defendants to injure the domestic United States steel industry. Plaintiff Geneva Steel Company is a domestic United States steel producer.

### Rule 12(b)(6) Motion to Dismiss Standard

In ruling on the Defendants' motion to dismiss, the court assumes the truth of all well-pleaded facts in Plaintiff's complaint and views them in a light most favorable to Plaintiff. *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 979, 108 L.Ed.2d 100 (1990). The court views all reasonable inferences in favor of the Plaintiff, and the pleadings are construed liberally. *Id.* The court may dismiss the complaint for failure to state a claim upon which relief can be granted only if it appears to a certainty that Plaintiff can prove no set of facts in support of its claim which would entitle Plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Jacobs, Visconsi & Jacobs Co. v. City of Lawrence,* 927 F.2d 1111, 1115 (10th Cir.1991). In reviewing the sufficiency of a complaint, the issue is not whether Plaintiff will prevail, but whether Plaintiff is entitled to offer evidence to support its claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

### Background

Geneva is the owner of a steel mill in Utah County, Utah. Geneva sells steel products to customers both within and outside of the United States. Geneva has its roots in World War II, commencing operations as a producer of steel for liberty ships. Geneva was originally owned and operated by U.S. Steel Co., which later became USX Corporation. In 1987, Geneva was purchased from USX by its present owners, who have since spent more than $370 million to modernize the plant.

According to the allegations of Geneva's complaint, during the 1980s and 1990s the entire U.S. Steel industry has undergone significant improvements and seen substantial investment in order to meet vigorous competition both at home and abroad. As a result the U.S. Steel market ranks among the world's most efficient producers of top quality steel plate. Geneva contends that its sales, and the sales of other domestic U.S. Steel producers, have been significantly affected in recent years by steel imported from countries outside of the United States. Ge-

neva cites industry publications and reports to show that as a result of these escalating imports, sales of steel plate inside the United States by domestic companies have fallen sharply in recent years. Geneva alleges that some of these imported products are being unfairly "dumped" into the United States at prices below their actual costs of production and their actual market value in their countries of production.

In response to these dumping practices in the early 1990s, domestic U.S. Steel companies filed complaints with the United States International Trade Commission, which is empowered to impose tariffs on any imports that are found to be improperly dumped in the United States. In 1994, the International Trade Commission found that steel imports from 11 countries—Belgium, Brazil, Canada, Finland, Germany, Mexico, Poland, Romania, Spain, Sweden and the United Kingdom—were in violation of United States anti-dumping laws and regulations. As a result, tariffs were imposed on steel imports from each of these 11 countries.

Prior to 1994, little or no steel plate manufactured in Russia, Ukraine and China was sold in the United States. Beginning in 1994, according to the allegations of Geneva's complaint, the Defendants began importing into the United States large quantities of steel plate from Ukraine, Russia and China. Geneva alleges in its complaint and in its moving papers that these imports were sold by Defendants in the United States at prices well below the actual market value and costs of production in the countries of origin and well below the costs at which steel plate could be produced by Geneva or the other U.S. steel companies. Geneva asserts that the price charged for these imports was as much as $100.00 a ton less than the prices offered by United States manufacturers and that these prices were significantly less than the prices charged for the dumped steel from the 11 countries previously found to be in violation of U.S. antidumping laws. As a result, Geneva's and other United States steel companies' sales fell drastically, with orders dropping as much as 65%. In November, 1996, Geneva claims to have laid off the equivalent of 185 workers due to the dumping practices of the Defendants. Geneva further alleges that the Defendants sold large quantities of steel from the three countries in question when it knew that the ITC had earlier determined that imports from the 11 offending countries were having a significant injurious effect on the health of the U.S. steel industry and with full knowledge that Mexico and Western European countries had already imposed significant tariffs on steel imported from Russia, Ukraine and China.

The Defendants, Thyssen and Ranger, are described by Geneva as knowledgeable and sophisticated steel traders. Thyssen is a subsidiary of Thyssen A.G., a German company that is one of the largest steel producers in the world with a history in steel production dating back to 1871. Ranger has operated in the United States steel market since 1958, and promotes itself as the "largest distributor of plate steel in the country."

Geneva asserts that Thyssen and Ranger have been able to import steel below cost from Ukraine and Russia largely because of the recent breakup of the Soviet Union. Prior to its dissolution the Soviet Union was the world's largest steel producer. Steel plants were built throughout the Soviet Union to maintain the Soviet Union's vast military and industrial complex. While the Soviet Union remained a strong international power, virtually all of its steel was utilized within its own borders. Whole cities were built up and around the Russian and Ukrainian steel mills. Then, when the breakup of the Soviet Union occurred in the early 1990's, this large consumption of steel in the former Soviet countries fell dramatically, from 101 million metric tons in 1991 to an estimated 49 million metric tons in 1996. Some of the steel mills in Russia and Ukraine closed, but many have stayed in nearly full operation for political and social reasons. The result of all of this has been large surpluses of steel in Ukraine and Russia which are available to be purchased at extremely cheap prices, well below the actual costs of production. Russia began exporting 60% of its steel output. Ukraine's exports rose to 75% of its steel production.

As explained earlier, Geneva has brought this suit under the Antidumping Act of 1916, which authorizes private causes of action

against importers of dumped goods. In addition to this suit, Geneva and other United States steel producers have petitioned the United States International Trade Commission for a finding of illegal dumping of steel from Ukraine, Russia and China, and have sought the imposition of tariffs on steel imports from those countries.[1] Geneva contends that notwithstanding the prospective tariff relief that may be obtained from the International Trade Commission, it is entitled to the damages permitted under the Antidumping Act of 1916.

### Historical Perspective

The 1916 Antidumping Act is best understood in the proper historical perspective. Beginning in 1913, the Democratic White House and Congress staged vigorous opposition to the power of domestic and international cartels and trusts. President Woodrow Wilson campaigned in 1912 on a message of free trade and fair competition: "The men who created the monopoly ... have taken advantage of the protective tariff [to] shut out competition and to make sure that the prices are in their own control." Wilson, *A Crossroads of Freedom: 1912 Campaign Speeches of Woodrow Wilson,* 156 (J. Davidson, ed.) (1956). During Wilson's first term, the Underwood Tariff Act was passed, reducing tariffs in order that "no concern shall [have] a monopoly ... gained other than through the fact that it is able to furnish better goods at lower prices than others." H.R.Rep. No. 5, 63d Cong., 1st Sess. 17 (1913). The Clayton Antitrust Act followed in 1914, expanding prohibitions against anticompetitive and predatory behavior, including price discrimination.

Across the Atlantic, World War I forced European manufacturers to turn their resources towards domestic defense, freeing U.S. industries from their foreign competition and serving "as protection more effective than any tariff legislation could possibly be." Taussig, *The Tariff History of the United States,* 448 (1931, reprinted 1967). Observing this prosperity, some U.S. government officials and legislators feared that after the war European industries would resort to selling their goods at artificially low prices, from necessity if not by choice, to recover a portion of the U.S. market. Representative Ed Saunders (D–VA), describing the scenario anticipated by the 1916 Act, warned that European manufacturers would have to "have business, profitable business if possible, but if not profitable, then business on any terms that will bring subsistence to the families of thousands of laborers" who had worked in the war effort. Vol. 53, Part 15, Cong. Rec. 1911 (1916) (Appendix). Secretary of Commerce William Redfield predicted that as a result "the outreach of American industries, nay their very existence in our own land in some cases, will be resisted to the full and every stratagem of industrial war will be exerted against them." Annual Report, Secretary of Commerce 43 (1915). He proposed that Congress enact antidumping legislation supplemental to the Clayton Act's domestic prohibitions against price discrimination. Such legislation would condemn the sale of foreign articles in the U.S. at a price "materially below" their price in the country of production. *Id.* at 41.

The Antidumping Act of 1916 was enacted as a small part of the Revenue Act, Ch. 463, 39 Stat. 798 (1916), passed that year. The antidumping provision received minimal debate on the floor of Congress and little or no discussion in the House and Senate reports accompanying the Revenue Act. *See* H.R.Rep. No. 922, 64th Cong., 1st Sess. 9–10 (1916); S.Rep. No. 793, 64th Cong., 1st Sess. (1916). President Wilson apparently issued no proclamation on signing the Revenue Act. Sidak, *A Framework for Administering the 1916 Antidumping Act: Lessons from Antitrust Economics,* 18 Stan. J. Int'l L. 377, 381 (1982).

The legislative history that does exist reveals that both Republicans and Democrats spoke out in favor of protecting U.S. industry against dumping, although they were divided over whether the proper course was

---

**1.** Relief from the United States International Trade Commission is primarily limited to prospective tariffs which are paid to the United States, for deposit into the general treasury, with no damages paid directly to any of the United States companies that may have been injured by the dumping.

implementing a protective tariff. Democrats believed that protective tariffs exacerbated income disparities by raising prices for working people without generating a rise in wages. 1912 Democratic Party Platform, quoted in *Zenith Radio Corp. v. Matsushita Electric Indus. Co.*, 494 F.Supp. 1190, 1217–18 (E.D.Pa.1980) Republicans countered that tariffs generated prosperity by "developing our resources, diversifying our industries, and protecting our workmen against competition with cheaper labor abroad, thus establishing for our wage-earners the American standard of living." 1912 Republican Party Platform, quoted in *Zenith*, 494 F.Supp. at 1218. The Democratic majority prevailed on the tariff issue, overpowering the Republicans' calls for that particular form of protectionism. The language ultimately chosen for the Antidumping Act of 1916 is an interesting blend of words connoting protection of both American industry and competition. The House Committee report states that the Act would place importers of foreign goods "in the same position as our manufacturers with reference to unfair competition." H. Rep. No. 922. This comment reflects the Democrat Party's ideal of protecting healthy competition. Interestingly, however, the language that was finally included in the Antidumping Act is not borrowed from the Clayton Act, which is the primary American antitrust law directed at unfair price discrimination. The Act does include phrases that are nearly identical to language in the Sherman Antitrust Act (i.e., prohibitions against "restraint of trade" and "monopolization"), but the 1916 Act also contains general prohibitions against any form of dumping committed with the intent of "injuring" an industry in the United States.

The Antidumping Act, as finally drafted, reads in its entirety as follows:

> It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets or the country of their production, or of other foreign countries to which they are commonly exported after adding to such market value or wholesale price, freight, duty, and other charges and expenses necessarily incident to the importation and sale thereof in the United States: *Provided*, That such act or acts be done with the intent of destroying or injuring an industry in the United States, *or* of preventing the establishment of an industry in the United States, *or* of restraining or monopolizing any part of the trade and commerce in such articles in the United States.
>
> Any person who violates or combines or conspires with any other person to violate this section is guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding $5,000, or imprisonment not exceeding one year, or both, in the discretion of the court.
>
> Any person injured in his business or property by reason of any violation of, or combination or conspiracy to violate, this section, may sue therefor in the district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages sustained, and the cost of the suit, including a reasonable attorney's fee.
>
> The foregoing provisions shall not be construed to deprive the proper State courts of jurisdiction on actions for damages thereunder.

15 U.S.C. § 72 (emphasis added).

The 1916 Act was soon considered ineffective as a dumping deterrent. In 1919, the Tariff Commission reported that the Act's required showing of intent made it "difficult, if not impossible" to enforce its purpose. Third Annual Report of the United States Tariff Commission 33 (1919). Congress responded by passing the Antidumping Act of 1921, 19 U.S.C. §§ 160–171 (repealed), which vested in the Secretary of the Treasury authority to impose duties on dumped goods without regard to the dumper's intent. *See* 59 Cong. Rec. 346 (1919). Criminal penalties for dumping and a private right of action for

treble damages are not provided in the 1921 Act nor the Trade Agreements Act of 1979, 19 U.S.C.A. §§ 1673–1673i, which repealed the 1921 Act but retained its substance.

Relatively few actions have been brought under the 1916 Act during its eighty-year history. The court discovered fifteen reported civil actions,[2] all but one commencing after 1970 and few dealing with significant substantive issues regarding the meaning of the words of the statute. Apparently, there have been four attempts to enforce the criminal provisions of the Act, but none was successful or generated a reported judicial decision. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 494 F.Supp. 1190, 1212 (E.D.Pa.1980) (quoting Marks, *United States Antidumping Laws—A Government Overview,* 43 Antitrust L.J. 580, 581 (1974)).

*Issue Presented*

■ Defendants' motion to dismiss is essentially premised on the argument that the Antidumping Act of 1916 is an antitrust act, not a protectionist act; that is, the Act is designed to protect competition, not competitors. Defendants point out—correctly—that Geneva has not alleged antitrust injury or predatory pricing. The Defendants contend that Geneva's complaint therefore fails to state a claim upon which relief can be granted. Geneva counters that the Antidumping Act of 1916 is *both* an antitrust act and a protectionist act.

Defendants proclaim with some vigor that virtually every court decision and every commentator who have addressed this issue have

resolved it in favor of Defendant's position. They point especially to *Zenith Radio Corp. v. Matsushita Electrical Industrial Co.,* 494 F.Supp. 1190, 1215 (E.D.Pa.1980) (holding "on the basis of the statutory text, the 1916 Act is an antitrust, not a protectionist statute"), and to a number of comments by executive branch officials, members of Congress and legal commentators that underscore the antitrust aspects of the 1916 Act. They point out that the Antidumping Act of 1916 was followed five years later by the Antidumping Act of 1921 for the express purpose of providing administrative protectionist relief that was not included in the 1916 Act, and which laid the framework for the present tariff remedies available from the United States International Trade Commission whenever foreign goods are actually dumped at unfair prices on United States soil. The Defendants argue that for more than 80 years the 1916 Act has been viewed only as an international extension of the Clayton Act and other United States antitrust laws, and, at the very most, is limited to international price discrimination carried out with predatory intent, whether sounding in antitrust or not. They stress the fact that the 1916 Act is a criminal as well as a civil statute, that it has never been successfully prosecuted by a criminal prosecutor, and that it has rarely been used by civil plaintiffs. They claim it would be unfair to now allow Geneva to dust off this four-score-old relic of a law and seek treble damages against the Defendants.

Geneva, at oral argument and in its briefs, acknowledges the Defendants' arguments and the various comments and opinions re-

---

**2.** *See H. Wagner & Adler Co. v. Mali,* 74 F.2d 666 (2d Cir.1935) (discovery); *Consolidated Inter. Automotive, Inc. v. Chen,* 51 F.3d 279, 1995 WL 139347 (9th Cir.1995) (plaintiff failed to prosecute 1916 claim); *Isra Fruit Ltd. v. Agrexco Agr. Export Co. Ltd.,* 804 F.2d 24 (2nd Cir.1986) (standing); *Western Concrete Structures Co., Inc. v. Mitsui & Co. (U.S.A.), Inc.,* 760 F.2d 1013 (9th Cir.1985); *CF & I Steel Corp. v. Mitsui & Co., (U.S.A.), Inc.,* 713 F.2d 494 (9th Cir.1983) (discovery); *Helmac Products Corp. v. Roth (Plastics) Corp.,* 814 F.Supp. 581 (E.D.Mich.1993) (default judgment); *Bridon American Corp. v. Mitsui & Co. (U.S.A.), Inc.,* 1983 WL 1897 (D.D.C.1983) (Fed.R.Civ.P. 11 violations); *Outboard Marine Corp. v. Pezetel,* 461 F.Supp. 384 (D.Del.1978) (requirement of foreign sale); *Jewel Foliage Co. v. Uniflora Overseas Florida Inc.,* 497 F.Supp.

513 (M.D.Fla.1980) (standing); *Cascade Steel Rolling Mills, Inc. v. C. Itoh and Co. (America) Inc.,* 499 F.Supp. 829 (D.Or.1980) (jurisdiction, venue); *Superior Coal Co. v. Ruhrkohle, A.G.,* 83 F.R.D. 414 (E.D.Pa.1979) (jurisdiction); *Schwimmer v. Sony Corp. of America,* 471 F.Supp. 793 (E.D.N.Y.1979) (standing); *Smokey's of Tulsa, Inc. v. American Honda Motor Co., Inc.,* 453 F.Supp. 1265 (E.D.Okla.1978) (jurisdiction, venue); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 402 F.Supp. 251 (E.D.Pa.1975); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 494 F.Supp. 1190 (E.D.Pa.1980) (giving extensive treatment to the statute's substantive issues) (*Zenith* is part of a ten-year litigation generating at least fifteen opinions; individual citations are omitted).

garding the 1916 Act. Geneva nevertheless presents a straightforward argument. The 1916 Act, Geneva contends, means precisely what it says, nothing more or less, notwithstanding *Zenith Radio Corp.* or any of the various statements made about the Act during the past 80 years.

■ After careful consideration and review of the parties' submissions, and the historical records, it is this Court's view that Geneva is correct. The 1916 Act means what its plain language says. In addition to its antitrust prohibitions, the Act has a protectionist component that prohibits dumping designed to injure the domestic steel industry. If Geneva can prove that these Defendants acted as importers for the systematic dumping of Chinese, Ukrainian and Russian steel in this country, with the intent of injuring, by any means, the domestic steel industry, Geneva will be entitled to the damages allowed by the Act. Thus, Geneva's complaint states a proper claim for relief. By its express language, the 1916 Act is not limited only to antitrust injury or predatory price discrimination. It is also designed to protect United States industry, which is precisely what Geneva has pled in its complaint. Consequently, the Defendants' Motion to Dismiss is denied.

### The 1916 Act

To repeat, the Antidumping Act of 1916, in pertinent part, states as follows:

It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets or the country of their production, or of other foreign countries to which they are commonly exported after adding to such market value or wholesale price, freight, duty, and other charges and expenses necessarily incident to the importation and sale thereof in the United States: *Provided*, That such act or acts be done with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of the trade and commerce in such articles in the United States.

15 U.S.C. § 72.

In the context of the present case this act has the following pleading requirements:

1) the common and systematic sale by the Defendants in the United States of articles imported from a foreign country

2) at a price substantially less than the actual market value or wholesale price of such articles in the country where they were produced

3) with the intent to injure the United States steel industry.

These three elements constitute Geneva's case. There is nothing in the statute itself, its legislative history, its construction by administration officials, or the occasional commentator's statements that undermines this basic construction of the Act.

The 1916 Act clearly delineates that an importer such as Thyssen or Ranger is prohibited from selling articles in the United States at a price below the actual market value of the articles in the country of production if, in making the sales, the importer possesses any one of the following five intentions:

1) the intent to destroy a United States industry;

2) the intent to injure a United States industry;

3) the intent to prevent the establishment of a United States industry;

4) the intent to restrain trade and commerce in the subject market; or

5) the intent to monopolize trade and commerce in the subject market.

Only the last two are traditional antitrust prohibitions. They seek to protect competition and are not directed at protecting competitors. But the first three just as clearly seek to protect United States industry. As such they are concerned with the well-being of American competitors. Whether the policy underlying the statute is good or bad, or

sound or unsound, is of course not at issue before this court. Congress chose the language of the Act, which this court finds for the purposes of the issue now before the court, to be unambiguous.

In making its determination, the Court employs all traditional methods and requirements of statutory interpretation. First the statute is read as a whole. In this connection, Defendants seem to contend that the statute is ambiguous when read in its entirety. They point to the literal language of the Act which prohibits dumping (i.e. the systematic sale in the United States of articles below their actual market value in their country of origin) with the "intent to injure" a United States industry. They argue that if any intended injury will suffice to constitute a violation of the 1916 Act, then this general provision encompasses all of the other intent prohibitions, i.e. 1) destroying an industry; 2) preventing the establishment of an industry; 3) restraining trade in the subject articles; or 4) monopolizing trade in the subject articles. Thus, they argue that anything beyond simple "injury" is superfluous, and this somehow renders the statute ambiguous.

While it appears accurate to state that the various intent provisions of the 1916 Act have some degree of overlap, it is not always so. It is conceivable, for example, that an importer could intend to restrain trade in a given article but not intend to destroy or injure an entire industry. It is also possible, for another example, that an importer could intend to prevent the establishment of an industry in the United States without an intent to restrain trade in the antitrust sense.

Recognizing the plain English meaning of the words of the statute allows its full application. Each of the five intent requirements has a plain English meaning that, depending on the facts of a given case, may or may not encompass the meaning of the other clauses. Each clause is capable of standing alone. To adopt the Defendants' interpretation would render the first three clauses effectively without individual meaning. Overlapping is not uncommon in statutes. See, for example, the federal RICO statute, 18 U.S.C. §§ 1961–1968, which, similar to the 1916 Act, carries both criminal and civil penalties.

The 1916 Act, as a whole, is capable on its face of only one reasonable meaning. The terms of the statute are broad, but the statute's specific intent requirements are sufficiently specific to avoid charges of vagueness or ambiguity. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 251 (E.D.Pa.1975). *See also, Screws v. United States*, 325 U.S. 91, 101–102, 65 S.Ct. 1031, 1035–1036, 89 L.Ed. 1495 (1945) ("[T]he requirement of a specific intent to do a prohibited act may avoid those consequences … which may otherwise render a vague or indefinite statute invalid."). The statute will be so interpreted by the court, and there is no need to resort to means of secondary interpretation such as legislative history or reference to other statutes. One of the most basic tenets of statutory interpretation holds that if the language of the statute is capable of only one reasonable interpretation based on the plain English meaning of the words of the statute, then such an interpretation will be followed and no further examination of secondary sources of interpretation is appropriate. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409, 113 S.Ct. 2151, 2157, 124 L.Ed.2d 368 (1993); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). It is this simple principle of statutory interpretation that the Defendants and a number of commentators who have addressed this Act seem to want to ignore.

The result reached by this process seems so apparent as to require no further analysis. The language of the Act is remarkably straightforward. Indeed, were it not for *Zenith Radio* and other occasional pronouncements that appear to run counter to the clear and plain words of the statute itself, this opinion would conclude now. But because of the possible confusion engendered as to this issue in the past, a fuller explanation is needed.

### Thyssen's and Ranger's Predatory Pricing Arguments

Thyssen and Ranger offer several arguments in support of their motion to dismiss, but each of these arguments is centered on

the Defendants' central theme that the 1916 Act is only an antitrust-type statute. Because of this antitrust-type status, the Defendants argue, a violation can only occur if a party acts with predatory intent and satisfies the specific requirements of predatory pricing. So structured, the Defendants' arguments have a logical flow. They point out that under the principal price-discrimination laws, including Section Two of the Clayton Act of 1914, and its successor, the Robinson–Patman Act, there are a number of well-established pleading requirements that must be satisfied by a plaintiff.

The first of these is an allegation by the Plaintiff that the Defendant is involved in sales in both of the subject markets. In this case, that would require a factual allegation that the Defendants participated in the sale of steel plate in the foreign markets in question as well as in the United States. Defendants stress that such a requirement is necessary under the antitrust laws to support a charge of predatory pricing—a point on which they are probably correct. They are also correct that no such allegation exists in Geneva's complaint.

Second, Defendants insist that there is no allegation by Geneva that the Defendants were selling steel plate at prices below their own costs. This, they assert, is a fundamental requirement of any self-respecting price-discrimination case under the antitrust laws, or any predatory pricing case, antitrust-based or not. Again, they are no doubt correct as to general antitrust law and predatory pricing principles. See *Brooke Group Ltd. v. Brown Williamson Tobacco Corp.*, 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). And the Defendants are correct that Geneva makes no allegation that Thyssen or Ranger was selling steel plate imported from the former Soviet countries or China below Thyssen's or Ranger's own costs. To the contrary, the assumption appears clear that Thyssen and Ranger were making a healthy profit on their United States domestic sales of Russian, Ukrainian and Chinese steel.

Third, Defendants assert that the complaint falls short of a complete and sustainable antitrust-type, price-discrimination action because there is no allegation that the Defen-

dants have any reasonable prospect of recoupment of their below-cost sales. Here again, pursuant to *Brooke Group*, Defendants are accurate in their presentation of antitrust price-discrimination law. Recoupment "is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation." *Id.* at 224, 113 S.Ct. at 2588. And Geneva has made no effort to allege any prospect of recoupment by Defendants.

These arguments must fail, however, if the 1916 Act has a protectionist reach beyond antitrust and traditional predatory price-discrimination pleading requirements. As stated above, the language of the Act itself, in addition to prohibiting antitrust violations, clearly and literally prohibits non-antitrust and non-predatory pricing conduct. By the words it chose, Congress protected United States industries from unfair dumping, whether the dumper possessed predatory intent or not. The intent required is the intent to "injure" a domestic United States industry. When the Act states that it is unlawful to sell dumped goods with the specific intent to injure a United States industry, it means precisely that. Defendants want to add the limitation that such injury can only occur if predatory pricing is involved, but the Act simply does not say so.

### The Prior Cases

As an initial matter, it should be noted that it is a mistake to assume, as Defendants suggest, that the issue now before the court—i.e., whether the 1916 Act always requires evidence of antitrust-like predatory pricing—has been squarely addressed and decided in favor of Defendants' position by the numerous courts and other authorities cited by the Defendants. In most respects, this case is one of first impression in the courts. *Zenith Radio* may appear similar, but even in that case the primary question before the court was different from the question presented in the instant case, as will be explained more fully below. As to the other cases and comments cited by Defendants, each was involved in circumstances and contexts different from the present controversy. This court is aware of no previous court or

other tribunal that has directly answered the question presented here.

The principal case cited by Defendants is *Zenith Radio* which was one opinion among many in the massive *In re Japanese Products* antitrust litigation that occupied considerable amounts of court time in the United States District Court for the Eastern District of Pennsylvania, the United States Circuit Court of Appeals for the Third Circuit, and the United States Supreme Court during the 1970's and early 1980's. The *In re Japanese Products* cases were centered primarily on purely antitrust actions under Sections One and Two of the Sherman Act[3]. The Antidumping Act of 1916 was a small part of this larger antitrust litigation.

In *Zenith Radio*, the court was faced with the defendants' motion to dismiss. The issue centered on the meaning of the term "such articles" within the 1916 Antidumping Act. The plaintiffs alleged that the defendants were unfairly dumping Japanese electronics products in the United States. The defendants contended that the electronic products in question—primarily television receivers— were sufficiently different in Japan and the United States to make the 1916 Act inapplicable. The Act, it will be remembered, makes it:

> unlawful for any person importing or assisting in importing any *articles* from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold such articles in the United States at a price substantially less than the actual market value or wholesale price of *such articles*

... in the principal markets of the country of their production.

15 U.S.C. § 72 (emphasis added.).

The district judge in *Zenith Radio* ultimately concluded that the 1916 Act requires "similarity" between the imported articles and the articles sold in the country of production. He found this requirement to be the same as the "like-grade and quality" standard under the Robinson–Patman Act. Using this standard, the district judge found that the television receivers imported into the United States were not sufficiently similar to the television receivers sold in Japan to meet the "such articles" requirement of the 1916 Act. In making this rather unremarkable decision, the court concluded that the 1916 Act was "an antitrust, not a protectionist" statute, a distinction that does not appear to be necessary for the Court's holding. Nevertheless, this dictum is relied upon heavily by Defendants in the present case. Defendants also cite to the following statement in *Zenith Radio:*

> The principal lesson which we draw from the legislative history of the 1916 Act, viewed against the historical background of the first Wilson administration, is that the statute should be interpreted whenever possible to parallel the 'unfair competition' law applicable to domestic commerce.

*Zenith*, 494 F.Supp. at 1223.

This language, however, is not necessarily supportive of Defendants' position in this case. The words "whenever possible" recognize that other interpretations are available. *Zenith Radio* unquestionably involved traditional predatory pricing allegations, the very kind that the Supreme Court in *Brooke Group* later found to require pricing below the seller's cost and a reasonable prospect of recoupment.[4] In that context, it is not par-

---

**3.** Section One of the Sherman Act generally prohibits combinations in restraint of trade and Section Two prohibits monopolization. See 15 U.S.C. §§ 1 & 2.

**4.** The Third Circuit Court of Appeals reversed in part the district court's decision in *Zenith Radio*, finding genuine issues of fact as to predatory price dumping by some of the defendants. On appeal to the United States Supreme Court, the high court held as to the Sherman Act claims that a showing of a reasonable possibility of recoupment was required in a predatory pricing case and because the plaintiffs had made no such

showing, reversed the Circuit on that issue. The 1916 Act issues were not addressed by the Supreme Court. Subsequently, on remand, the Circuit ordered the Sherman Act (Sections One and Two) claims dismissed and also determined in a brief statement that the Antidumping Act claims should suffer the same fate. Defendants cite this as authority for the proposition that the 1916 Act requires predatory pricing in all cases. As stated above, such a holding would be contrary to the language of the 1916 Act. To the extent that the Third Circuit so held, this court disagrees, but it appears more likely that the Third Circuit did not

ticularly noteworthy that the court would focus on the antitrust aspects of the 1916 Act. Such a focus, of course, cannot obliterate three-fifths of the Act's bases for liability.

*Zenith Radio* did not reach the precise issue presented in the instant case. However, to the extent *Zenith Radio* can be read to compel a finding that the 1916 Act has no protectionist aspects, as distinct from antitrust aspects, this court respectfully disagrees. Such a holding could only be reached by the judicial branch rewriting the statute, and thereby inappropriately invading the terrain of the legislative branch.

If Congress had intended to make the 1916 Act solely an international extension of domestic "unfair competition" laws, it surely possessed the ability to say so. It could have stated something as simple as "the United States antitrust laws shall be applicable to foreign countries and their importers." But Congress chose the language it did. Fortunately for this court's present task, that language is not difficult to read or interpret.

The other few published cases that have dealt with the 1916 Act have done so in contexts different from the present case, and none of these decisions appears to be in disagreement with this court's holding. Any notion that the great weight of case-law authority compels a finding that the 1916 Act has only an antitrust purpose, and no protectionist component, is unsupported by the cases. The significant reported cases are briefly recounted below.

In *Helmac Products Corporation v. Roth (Plastics) Corporation,* 814 F.Supp. 560 (E.D.Mich.1992), the court was required to decide which statute of limitations is applicable to the 1916 Act. The Act itself contains no statute of limitations. The choices were the four year statute of limitations of the Clayton Act urged by the Defendant and the five year statute of limitations of the Tariff Act as urged by the Plaintiff. The court looked closely at the history of the Act, at *Zenith Radio,* and at *In re Japanese Products,* and adopted the four year statute of limitations. The district court explicitly recognized both antitrust and protectionist aspects of the

1916 Act, and was persuaded that in the narrow question before it (of selecting a limitations period), the 1916 Act was more analogous to the antitrust statutes. *Id.* at 566. The district court stated, "This does not mean that the Antidumping Act of 1916 must be interpreted consistently with the antitrust statutes in all situations. The language differences may have serious implications in other contexts." *Id. Helmac* is thus consistent in all respects with the decision reached by the court in the instant case.

In *Outboard Marine Corp. v. Pezetel,* 461 F.Supp. 384 (D.Del.1978), the plaintiff complained that the defendant was unfairly dumping golf carts made in Poland into the United States domestic golf cart market. The defendant moved to dismiss on the ground that there was no market for golf carts in Poland, and therefore there could be no showing that the golf carts had an actual market value or wholesale price in Poland. The court agreed. Obviously, we have no such issue here. Steel industries exist in Russia, China and Ukraine.

*Bywater v. Matsushita Electric Co.,* 1971 Trade Cas. 73,759, 1971 WL 574 (S.D.N.Y. 1971) and *Schwimmer v. Sony Corp.,* 471 F.Supp. 793 (E.D.N.Y.1979) dealt with the question of standing. That issue was decided consistent with the express language of the 1916 Act that permits "any person injured in his business or property by reason of any violation of . . . this section" to sue for treble damages, attorneys fees and costs. Similar language in the antitrust laws, 15 U.S.C. § 15, and the cases and interpretation of standing in conjunction with the antitrust statutes was referred to in both of these cases as helpful precedent on the standing issue. In the instant case we have no such issue involving Geneva's standing to sue. Neither of these cases dealt with the issue presented here.

In an earlier opinion in *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 402 F.Supp. 251 (E.D.Pa.1975), the district court dealt with the defendant's contention that the 1916 Act was unconstitutionally vague. The court found the terms of the statute to have a

address the precise question at issue in the present case.

clear meaning. There is no holding that the 1916 Act is solely an antitrust statute and that it contains no protectionist components.

In *Western Concrete Structures Co., Inc. v. Mitsui & Co. (USA), Inc.*, 760 F.2d 1013 (9th Cir.1985), the Ninth Circuit recognized a protectionist component in the 1916 Act. The plaintiff sued a competitor who purchased dumped goods and the district court denied standing. The Ninth Circuit affirmed finding that "the express purpose of the Act is to protect domestic industries from dumping by their foreign competitors" but that this protection extends only to those in competition with the alleged dumper, not merely with the dumper's buyers. *Id.* at 1019. Geneva produces the same product as that allegedly dumped and can therefore claim protection under the 1916 Act because it directly competes with Russian, Ukrainian and Chinese steel producers and their importers.

The question in *Jewel Foliage Co. v. Uniflora Overseas Florida Inc.*, 497 F.Supp. 513 (M.D.Fla.1980) and *Isra Fruit Ltd. v. Agrexco Agr. Export Co. Ltd.*, 631 F.Supp. 984 (S.D.N.Y.1986) was whether the 1916 Act provides a cause of action to an importer as well as a manufacturer. Antitrust concepts play an important part of both courts' analyses, which conclude that importers as well as manufacturers are entitled to bring suit because both may suffer from unfair competition's restraint of markets which the Act intends to deter. *Jewel* at 517; *Isra* at 989. Both courts characterize the Act as antitrust legislation but do not disclaim a protectionist component, acknowledging that the Act's initial purpose was to protect domestic manufacturers. *Id.*

### The 1921 Act

Defendants also point to protectionist legislation passed subsequent to the 1916 Act as evidence of the limited antitrust scope of the 1916 Act. In particular, they cite to the following statement made during the 56th Congress in support of the Antidumping Act of 1921:

> The Tariff Commission declares that [the 1916 Act] is not workable, for the reason that it is almost impossible to show the intent on the part of the importer to

injure or destroy business in the United States by such importation and sale.

> That's the trouble with this Antidumping Act of 1916, which is now the law. You have to show the intent of the foreigner, the intent of the importer, to injury or destroy some particular industry of the United States.

56 Cong. Rec. 346 (Dec. 9, 1919).

This language recognized the difficulty a plaintiff under the 1916 Act faces in attempting to prove that a Defendant possessed the intent to injure a United States industry. That difficulty may be as real today as it was in 1921, but it does not eliminate a private cause of action under the authority of the 1916 Act to attempt to show such intent. The fact that a law may be difficult to prove, as a practical matter, does not mean it is nonexistent or that it has been repealed. There is no question that the 1921 Antidumping Act was designed to provide Antidumping protectionist relief to United States industries and that the 1916 Act was perceived as difficult to prove and in that sense ineffective in its protectionist purposes. Indeed, the 1921 Act and its successors have provided Geneva and other United States steel manufacturers with a viable forum with the United States International Trade Commission which led to the tariffs against the aforementioned 11 countries in 1994 and more recently has led to an early determination that tariffs will also be imposed on imports from Ukraine, Russia and China. These administrative remedies do not contain the intent requirement of the 1916 Act and in other ways are easier to prosecute than a private cause of action under the 1916 Act. The administrative relief is also different than the remedies provided under the 1916 Act. The United States International Trade Commission is empowered to impose with rare exceptions only prospective tariffs and the money collected goes into the general treasury of the United States, not to the affected companies themselves or the relevant U.S. industry. But the 1921 Act and its successors did not repeal the 1916 Act and they certainly did not change the 1916 Act's original meaning.

Rather than support the Defendants' position, the above statement in support of the 1921 Act supports the Plaintiff's position. The statement in no manner suggests that the 1916 Act is not a protectionist act and that it is limited only to antitrust purposes. To the contrary, the statement correctly reflects an attitude in 1921 that the 1916 Act's *protectionist* purposes were not working very well, thereby recognizing that the 1916 Act actually had protectionist aspects. The statement accurately articulates that the 1916 Act requires showing the "intent of the importer, to injure or destroy some particular industry in the United States," without any suggestion that the 1916 Act could only be violated by predatory pricing. As has been borne out by the 80 year history of the 1916 Act, the necessary proof of intent is not perceived as easy to satisfy, but the Act was most certainly not repealed, or even amended, by the 1921 Act or any other subsequent enactments.

### Executive Branch Officials' Comments

The Defendants' reference to the occasional statements of executive branch officials and to commentators as to the meaning of the 1916 Act are equally unpersuasive to the court. For the most part, these comments and *opinions* are unhelpful because they are taken out of context or are only part of a larger discussion that does not involve the question presented in the instant case.[5] The majority of the executive branch statements came in connection with a proposed bill in the 99th Congress which was designed to amend the 1916 Act and give greater protectionist relief to domestic United States industries. The bill was titled "Unfair Foreign Competition Act of 1985." Its stated purpose was to:

(1) permit private civil rights of action in Federal court to enforce laws against dumping, subsidy, and customs fraud;

(2) permit injunctive relief against continued illegal importation; and

(3) provide damages for injuries sustained. S. 1655, 99th Cong. (1985). Moreover, the requirement that dumping be done with the specific intent to injure or destroy a U.S. industry would have been eliminated.

Virtually all executive branch agencies that offered input to Congress regarding this bill were opposed to it. The opposition came in essentially two forms. One was a feeling that existing laws were sufficient, especially given the availability of administrative antidumping tariff relief that was established under the 1921 Act, as amended. The other was a concern for the chilling impact the bill could have on what the executive branch agencies viewed as desirable foreign competition. The statement by the Department of Justice is typical of these comments. "[T]his bill, if enacted, is likely to stifle legitimate import competition, to the detriment of consumers and domestic sellers, while failing to accomplish its stated objective of according more expeditious treatment to dumping complaints." *Senate Comm. Judiciary Report to Accompany S. 1655*, No 99–295, 99th Cong. 2d Sess. (May 13, 1996) at 15. "[U]nder existing law domestic industries have an adequate administrative procedure to offset any injurious effects of imports sold at less than fair value." *Id.* at 14.

It is interesting to note that in discussing this proposed amendment to the 1916 Act, not one of the executive branch officials opposing the proposed law states that the 1916 Act is devoid of a protectionist component. Indeed, the converse is true. Assistant Attorney General John Bolton's written state-

---

**5.** Defendants refer specifically to letters written to Senator Strom Thurmond, chairman of the U.S. Senate Committee on the Judiciary, by U.S. Trade Representative Clayton Yeutter and General Counsel of the Department of Commerce Douglas Riggs voicing their opposition to the proposed "Unfair Foreign Competition Act of 1985." Defendants contend those letters support their view that the 1916 Act is not a protectionist act and is limited only to antitrust principles. The letters do not support Defendants' position. The focus of the letters was not to express agency views on whether the 1916 Act is protectionist or antitrust in nature but to gather information about whether various executive branch agencies supported or opposed the passage of the proposed act. The agencies' opposition to the passage of the proposed act was based on varying officials' conclusions that the bill was inconsistent with the United States' international obligations under the General Agreement on Tariffs and Trade ("GATT") and the 1979 GATT Antidumping Code, *not* on their belief that the 1916 Act is an antitrust statute.

ment on behalf of the Department of Justice is typical of the general description of the 1916 Act. "The antidumping laws . . . are not intended to protect consumers or enhance competition, but to protect domestic industries from low-priced imports." *Id.* at 15.

The occasional mention by these officials that the 1916 Act is an international extension of the Clayton Act and their general reference to the 1916 Act as an antitrust act accurately reflects the fact that the 1916 Act has antitrust aspects. It does not, however, mean that the 1916 Act has no protectionist aspects. As was the case in 1921, the discussion in the mid–1980s focused on the fact that the 1916 Act was ineffectual as a protectionist statute. In that regard, the debate implicitly recognized that the 1916 Act has a protectionist component.

### Legal Commentators' Comments

As to those legal commentators who seem to believe that the 1916 Act only prohibits antitrust-type predatory pricing (see, for example, Jeffrey L. Kessler, *The Antidumping Act of 1916: Antitrust Analogue or Anathema*, 56 Antitrust L.J. 485 (1985)), this court will only note that these positions generally appear to reflect the commentators' policy preferences but are not accurate articulations of the actual language of the 1916 Act. Mr. Kessler, for example, in a twelve-page article fails to even quote the actual language of the statute. Within the first 2 pages of his article he limits the Act's reach to predatory pricing without finding such a result in the actual wording of the Act itself.[6] During the drafting of this opinion, coincidentally, a Note was published in the Harvard Law Review which advocates an interpretation of the 1916 Act squarely in harmony with this opinion. The author of that Note states as follows:

Commentators overwhelmingly ignore the language of the 1916 Act and assert that the Act requires proof of "predatory

intent" as that term is understood in antitrust law.

\*      \*      \*      \*      \*      \*

The touchstone for interpreting any statute must be its language. The language of the 1916 Act, as well as its legislative history and historical context, demonstrates that the Act does not require antitrust predatory intent in all cases. The 1916 Act penalizes dumping undertaken with the intent of "destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States." Thus, by its own terms, the statute specifies five discrete intents, any one of which is sufficient to create a statutory violation. Only the latter two, however, solely concern anticompetitive effects.

Congress's use of the disjunctive "or" to connect the statutory terms indicates that each phrase has a distinct meaning with independent significance. Moreover, a "cardinal rule of statutory interpretation [holds] that no provision should be construed to be entirely redundant;" each phrase is presumed to contribute something unique to the statutory command. Therefore, although the precise nature of the intent referred to in the first three clauses is not entirely self-evident from the face of the statute, antitrust injury to an industry inflicted by anticompetitive conduct clearly cannot be all that the statute forbids. Interpreting the 1916 Act as nothing more than an antitrust law would effectively read the "injury to industry" component out of the statute by reducing it to mere surplusage—a repetition of the prohibitions on anticompetitive conduct that it precedes.

Because the language of the 1916 Act protects U.S. industry from harms other

---

**6.** *See also* Joseph Gregory Sidak, *A Framework for Administering the 1916 Antidumping Act: Lessons from Antitrust Economics*, 18 Stanford Journal of Int'l L. 377 (1982), Jacob Viner, *Dumping: A Problem in International Trade*, 123 (1923); *Report of the Ad Hoc Subcommittee on Antitrust and Antidumping*, 43 Antitrust L.J.653 (1974);

U.S. Department of Justice and Federal Trade Commission, *Antitrust Enforcement Guidelines for International Operations*, 8 (1995) (stating the Act "is not an antitrust statute, but its subject matter is closely related to the antitrust rules regarding predation").

than just antitrust injury, the statute stands in stark contrast to antitrust laws, which protect competition, not individual competitors. Comparison of the 1916 Act language to the 1914 Clayton Act confirms this difference in scope. The language of the 1916 Act forbids, among other things, conduct intended to injure U.S. competitors, whereas the original provisions of the Clayton Act forbid practices whose "effect . . . may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

Note, *Rethinking the 1916 Antidumping Act,* 110 Harv. L. Rev. 1555, 1557–58 (1997) (citations omitted).

While it is encouraging to read such commentary that recognizes the plain meaning of the words of the 1916 Act, the article itself is only of academic interest when the Act in question is plain and unambiguous as to its meaning. This is of particular significance in interpreting a criminal statute.

### Legislative History

As stated earlier, because of this court's finding that the 1916 Act is unambiguous, it is not necessary to examine the 1916 Act's legislative history, although to do so presents an interesting picture of by-gone days. As described above, 1916 was an interesting time in American history with the first World War occupying Europe and Woodrow Wilson occupying the White House. The Democratic party controlled Congress as well as the Presidency. Republican protectionist ideas were hotly debated in political campaigns and the halls of Congress, just as was the Democratic party's ideal of a non-protectionist fair market. Times have indeed changed.

Even if this court were to rely on the scant body of legislative history pertinent to the 1916 Act, that history provides support for Geneva's protectionist position. Especially when coupled with the language Congress chose to employ in the final draft of the Act, it would require something approaching willful blindness to ignore the protectionist components of the final bill. As expressed earlier, to limit the Act solely to its antitrust prohibitions would require reading completely out of the text the language dealing with the "intent to destroy, injure, or prevent the establishment of," a United States industry. Under Defendants' interpretation, the final two intent clauses—those dealing with the intent to restrain or monopolize trade—would be the only operative clauses of the statute because those pro-competition antitrust clauses surely include within their reach any predatory pricing scheme, to which purpose, according to the Defendants, the Act is confined.

Defendants stress that the House Committee Report on the Antidumping bill of 1916 recommended adoption of the legislation so that importers "may be placed in the same position as our manufacturers with reference to unfair competition" (H. Rep. No. 922.) They point to this statement as evidence that the 1916 Act is limited to antitrust purposes.

The statement in the Committee Report appears to be accurate as far as it goes. The 1916 Act indeed subjects foreign countries and their importers to United States antitrust laws. It is no doubt true that some Members of Congress in 1916 preferred to limit the reach of the 1916 Act to that extent. However, the Committee Report does not state that the Act is devoid of any other purpose and surely no one seriously contends that a Committee Report can undo the actual plain language Congress places in a bill.

Furthermore, the legislative history contains clear indications that the language in the final bill is precisely what it needed to be to get the bill passed, given the existence of a large Republican minority that was unquestionably in favor of protectionism for United States companies. For example, the 1912 platform of the Republican Party stated as follows:

> We reaffirm our belief in a protective tariff. The Republican tariff policy has been of the greatest benefit to the country, developing our resources, diversifying our industries, and protecting our workmen against competition with cheaper labor abroad, thus establishing for our wage-earners the American standard of living. The protective tariff is so woven into the fabric of our industrial and agricultural life that to substitute for it a tariff for revenue

only would destroy many industries and throw millions of our people out of employment.

*Zenith Radio Corp.*, 494 F.Supp. at 1218.

During World War I, despite the great prosperity of American industry, government officials and legislators from both parties remained fearful that at the end of the war, European industries would resort to unfair pricing and predatory methods of competition in an effort to revive themselves. Such competition, they feared, would be ruinous to American industry. *Id.* at 1219. It is at this point in time that the 1916 Act was enacted. The conditions facing the United States steel industry today are strikingly similar to the concerns that faced American industry during World War I. For several decades, the United States was engaged in a Cold War with the Communist Bloc. During those hostilities, the steel industries of China, Russia and Ukraine were prosperous. They provided great amounts of steel to the governments of those countries for the production of weapons and other strategic purposes. Since the end of the Cold War, however, the demand for steel in those countries has decreased significantly. This condition has left not only the steel industries of China, Russia and Ukraine, but the entire economies of those nations struggling for economic and social stability. The need of those countries to obtain employment and hard currency to provide subsistence to thousands of laborers has left an international market vulnerable to dumping.

In the final analysis, it appears from the legislative history of the 1916 Antidumping Act that it may have meant different things to different Members of Congress. Both the protectionist and solely-antitrust interpretations find some support in the reported remarks. However, one thing is unquestionably clear: the bill's final language clearly protects United States industries from dumping practices carried out with the intent to injure the industry. It reflects a policy to protect competitors as well as to protect competition. No interpretation to the contrary by any sponsoring member can change that plain English meaning.

*Competition*

Defendants argue that if the 1916 Act is construed to permit a cause of action against an importer without proving predatory pricing and predatory intent, then the Act forbids:

"a company simply doing what all companies do—competing for business by offering customers prices that are more attractive than the competition. Since any corporate pricing strategy inevitably will be accompanied by an intent to "injure" other firms (including United States firms) by wining business, Geneva's reading of the Act effectively would result in a *per se* violation of the Act whenever there is international price discrimination."

Ranger's Reply Brief, pp. 1–2.

■ This statement represents perhaps Defendants' biggest fallacy in their overall argument. The Defendants seem to want to argue their defense—indeed their entire case—in conjunction with a motion to dismiss. The 1916 Act in no way criminalizes normal competition or capitalism. It simply forbids dumping below-market value goods in America with the intent to injure an American industry. As stated earlier, the burden of proving such improper intent may not be easy. Absent some compelling evidence, it may be nearly impossible. An expected defense in this type of case is that the importer was motivated solely by making a profit for himself, not injuring an industry in the United States, and therefor lacked the necessary intent to injure. Mere knowledge on the part of the importer that his sales will capture business away from his United States competitors, standing alone, will not be sufficient to demonstrate an intent to injure the entire United States steel industry and will therefore be inadequate to establish a violation of the Act. But to say that the only way an intention to injure can be found violative of the 1916 Act is in connection with predatory pricing would be to carve out an exemption for brokers or importers, such as the Defendants in this case, who are allegedly taking advantage of a glut of steel in certain foreign countries due to political changes by systematically dumping the steel in the Unit-

 

ed States and making large profits in the process. This of course they are free to do without liability under the 1916 Act provided they do not possess the requisite intent to injure the United States steel market. If Defendants' argument has merit, it would be properly brought in a motion for summary judgment, at the earliest, not as the basis for a Rule 12(b)(6) motion to dismiss.

### Pleading Requirements

Defendants argue that Plaintiff's complaint should be dismissed because the facts supporting Geneva's allegations are not plead with sufficient particularity and detail. They point specifically to Geneva's factual allegations regarding the "actual market value" or "wholesale price" of the steel in the countries of production. Geneva refers to "costs of production" in certain portions of its complaint and in its memoranda, indicating that Geneva may be relying on costs of production as proof to satisfy the statute's requirement that the sales in the United States must be substantially less than the "actual market value or wholesale price" in the country of production or other foreign countries where the product is commonly exported. However, in stating its specific causes of action against each Defendant, Geneva pleads precisely the language of the statute. Under the circumstances of this case, that is sufficient. Given Geneva's assertions regarding the low cost of the steel imported from the three countries in question, and the other recent history recounted in Geneva's papers, the Court is satisfied that the requirements of Rule 8(b) of notice pleading have been met and Rule 11 is satisfied. Defendants may confuse sufficiency of proof with minimum pleading requirements. At this point in time, the Court makes no decision as to whether evidence of cost of production is sufficient to make out a case under the 1916 Act.[7] It is clear, however, that the causes of action in this case are properly plead.

### Summary and Conclusion

For the foregoing reasons, the court determines that the Antidumping Act of 1916 is susceptible of only one clear meaning under the circumstances of the instant case. Plaintiff has adequately plead its case by alleging that the Defendants sold foreign steel in the United States at prices substantially less than the actual market value or wholesale price of such steel products in the countries of production, all with the specific intent to injure the United States Steel Industry. Defendants' Motion to Dismiss is DENIED.

---

7. Costs of production may be relevant to a factual determination of actual market value or of wholesale price, but that issue has been insufficiently briefed in the present motion to dismiss to permit a final decision at this time.